[No. 15123.    Department Two.    July 30, 1919.]

## THE STATE OF WASHINGTON, *Respondent*, v. MARY SWARTZ, *Appellant*.[1]

CRIMINAL LAW (385)—APPEAL—NECESSITY OF OBJECTIONS—INFORMATION. Objections that an information is duplicitous and too uncertain cannot be first made in the supreme court.

HOMICIDE (69)—EVIDENCE—DYING DECLARATIONS—ADMISSIBILITY. In a prosecution for homicide by performing an abortion, a dying declaration of the deceased on the evening of her death is admissible where it states that she consulted and was treated by the defendant, for that purpose, that defendant used a catheter and made deceased feel pretty sick, and knew what she was doing.

SAME (69). Where such declaration contains statements relating to the acts of another in no way connected with the *res gestae*, they should be stricken.

SAME (69). The statement that deceased heard defendant tell another over the phone what she had done is admissible not as part of the *res gestae*, but as an admission of the accused.

SAME (70). A dying declaration made nine days subsequent to entering a hospital and in a sense recitals of a past event is admissible, when it but describes links in the chain of criminal conduct that was not complete until death was accomplished by the illegal operation.

CRIMINAL LAW (158)—EVIDENCE—EXPERTS—HYPOTHETICAL QUESTIONS. In a prosecution for homicide by performing an abortion, it is proper to allow physicians to testify, in answer to questions fairly summarizing the facts which the state's evidence tended to prove, that the proximate cause of death was the act of the defendant in introducing a catheter into the uterus of a pregnant woman.

HOMICIDE (89)—TRIAL—RECEPTION OF EVIDENCE—DYING DECLARATIONS. In a prosecution for homicide, the accused is entitled to display to the jury the proven signature of the deceased to a dying declaration, where it was on a sheet separate and apart from the declaration itself and could not confuse the jury.

CRIMINAL LAW (358-1) — HOMICIDE (127) — NEW TRIAL — NEWLY DISCOVERED EVIDENCE—IMPEACHMENT OF WITNESS. In a prosecution for homicide in performing an abortion, it is an abuse of discretion to refuse a new trial for newly discovered evidence tending to show

[1]Reported in 182 Pac. 953.

that the deceased's dying declaration as to defendant's use of a catheter was false and that the mother of the deceased had given false testimony upon a material point, and had she testified to the truth, the jury might have reached a different conclusion.

Appeal from a judgment of the superior court for Spokane county, Hurn, J., entered June 28, 1918, upon a trial and conviction of manslaughter. Reversed.

*W. C. Donovan, Geo. H. Armitage, Robertson & Miller,* and *Turner, Nuzum & Nuzum,* for appellant.

*John B. White, H. G. Kinzel,* and *Fred J. Cunningham,* for respondent.

HOLCOMB, C. J.—Defendant was found guilty of manslaughter under an information charging that, through the performing of an abortion not necessary to the preservation of the life of the child or of the pregnant woman, she caused the death of the patient. Defendant unsuccessfully interposed a motion for new trial, and from judgment upon the verdict, she appeals.

After the appeal was perfected and just prior to the submission of the appeal in this court, Messrs. Turner, Nuzum & Nuzum, new counsel for appellant, who had not participated in the trial or proceedings theretofore, filed an application asking leave to assign as a new ground of error not assigned in the original assignments of error by appellant, that the court below erred in overruling the demurrer of appellant to the information. The ruling upon this matter was reserved until consideration of the case upon the merits, and respondent was given an opportunity and time to furnish a memorandum of authorities in resistance of the application and as to the question of the sufficiency of the information. However, we do not find anywhere in the record any demurrer to the information in the court below, nor any order of the court below overruling a demurrer. While it is generally accepted that

an information or indictment may be attacked for the first time on appeal on the ground that it does not charge any facts sufficient to constitute a crime, that rule does not apply to an objection to an information upon the ground that it does not substantially conform to the requirements of the code, or that more than one crime is charged, or that the information contains matter which, if true, would constitute a legal defense or bar to the action. The attack, upon this attempted new assignment of error, is upon the ground that the information is duplicitous in charging more than one crime, and is too uncertain as to which crime was intended to be charged to satisfy the requirements of the law. For the above reasons, we conclude that we cannot consider this attempted new assignment of error.

The evidence is in sharp conflict. In her defense, appellant introduced evidence that, about November 1, 1917, a man unknown to her called at her office and requested treatment for a girl who was in trouble; that she declined, and a day or so later he returned with Fay Hamilton, whom he introduced as his niece, but he was ordered from the office, but returned alone the following morning in quest of advice as to a private sanitarium in which to place his niece. Among the places mentioned was that of Mrs. Williams, located near appellant's residence. At 8 p. m. Friday, November 9, 1917, Mrs. Williams requested appellant to stop in at the sanitarium on her way home. Appellant arrived at the hospital about 8:20 p. m., and was taken to a room in which were Fay Hamilton, Mrs. Flora Hamilton (the girl's mother), Mrs. Hindes and Mrs. Williams. The girl's mother at that time informed appellant that the daughter was wayward; that she had told her mother that she had been operated on by a soldier; that she had operated on herself; that a cer-

tain physician had given her pills, and that she had been taking turpentine. Appellant made no examination of the girl, nor did she treat or prescribe for her in any manner, remaining only about fifteen minutes at the sanitarium.

The girl's mother testified that she did not know until Sunday afternoon, November 11, that her daughter was in the sanitarium, and the next morning, November 12, she took her daughter home; that appellant was not at the sanitarium and that she saw no one but the nurse; that she never conversed with appellant nor saw appellant to know her before the trial, and that she (the mother) was at the sanitarium only on the evening of November 11 and the morning of November 12.

There was evidence that, when the girl was brought to the sanitarium on Friday evening by her mother and Mrs. Hindes, she was "flowing"; that no medicine was administered; that, when on Sunday the mother made telephonic inquiry as to the condition of her daughter, the calling of a physician was advised. Dr. Loffler called between six and seven p. m. Sunday and curetted the patient's uterus. He also attended her a few days following at her home. Sunday evening, November 18, Dr. Sutherland was called to the girl's home, where he wrote what was offered in evidence as the dying declaration of Fay Hamilton. The girl died that night.

Appellant assigns as error the admission in evidence of the dying declaration, the admitted portion of which is as follows:

"I went to Dr. Swartz first. She used a catheter. This was out at the nurse's place on Broadway and Elm. I stayed there from Friday night till Monday. Called Dr. Loffler up Sunday night and he used a douche. He put some stuff in my arm. He gave me an anesthetic. He told me he was going to give me a

douche. I don't know what was done. I was all right when I went to Dr. Swartz and I knew I was pregnant about four months and asked her to get rid of it. I felt pretty sick when they brought me home on Monday. I had a chill on Sunday night. Dr. Swartz knew what she was doing. I heard Dr. Swartz tell Dr. Loffler over the phone what she had done."

The proper foundation having been laid, this declaration was clearly admissible with certain exceptions. The statements: "Called Dr. Loffler up Sunday night and he used a douche. He put some stuff in my arm. He gave me an anesthetic. He told me he was going to give me a douche. I don't know what was done," all clearly relate to the acts of another than the accused, with whom she was in no way connected, form no part of the *res gestae,* or declarations as to the acts and conduct of the accused, and were clearly improper. They should have been stricken. We cannot consider them as having been presumptively prejudicial to the appellant and would not reverse the judgment upon the admission of them alone. Upon a new trial, however, the above portion should be excluded.

"Dying declarations are statements of material facts concerning the cause and circumstances of the homicide. . . . They are restricted to the act of killing, and to the circumstances attending it, and form part of the *res gestae.* When they relate to former and distinct transactions, and embrace facts or circumstances not immediately connected with the declarant's death, they are inadmissible." *State v. Baldwin,* 79 Iowa 714, 45 N. W. 297.

Facts, and not conclusions, opinions or inferences, are admissible as dying declarations, just as in nonexpert testimony of a living witness, and more particularly so because the deceased cannot be observed or subjected to cross-examination. *Montgomery v. State,* 80 Ind. 338, 41 Am. Rep. 815; *State v. Center,* 35 Vt.

277; *State v. Eddon,* 8 Wash. 292, 36 Pac. 139; 1 Green-leaf, Evidence, § 156.

Tested by these rules, the declarations properly admissible are: "I went to Dr. Swartz first. She used a catheter. This was out at the nurse's place on Broadway and Elm. I stayed there from Friday night till Monday. I was all right when I went to Dr. Swartz and I knew I was pregnant about four months and asked her to get rid of it. I felt pretty sick when they brought me home on Monday. I had a chill on Sunday night. I heard Dr. Swartz tell Dr. Loffler over the phone what she had done." This last statement being admissible, not as a part of the *res gestae* properly, but as a statement of an admission or declaration by the accused, which would be proper evidence on the part of a witness thereto on the stand in and connected with her acts. Although the statements of deceased were made approximately nine days subsequent to the time she entered the hospital, and in a sense are recitals of a past event, they but describe links in the chain of criminal conduct which was not complete until her death was accomplished by reason of the illegal operation. Her statement that "I felt pretty sick when they brought me home on Monday. I had a chill on Sunday night. . . . " tends to show that the operation described by her had been performed.

Appellant also complains of rulings of the court on certain questions put to Drs. Sutherland and Epplen and the answers given by them as experts. Dr. Sutherland was permitted to testify, over objection, that, taking into consideration the conversation he had with Fay Hamilton and which he reduced to writing, and from what he observed at the autopsy, the immediate cause of the girl's death was blood poison or septicemia, the result of a criminal abortion. The word "criminal" was stricken from the answer. He further

testified that, in his opinion, taking the matter of the dying declaration and what he observed at the autopsy, as well as the conversation had with deceased when she was making the dying declaration, the proximate cause of the contracting of the blood poison was the insertion of a dirty catheter into the uterus; that he based his statement upon the dead girl's dying statement that she had a chill.

Dr. Epplen was asked:

"Assuming that on the 9th day of November, 1917, Fay Hamilton was in good health, was four months pregnant, that a catheter was used upon her to produce an abortion, that subsequently to that, on Sunday, she had a chill, that thereafter a currettement was performed to remove pieces of afterbirth, and that thereafter she died on the 18th day of November; now assuming that all those facts which I have related or told you, and basing your opinion upon those facts and what you discovered at the autopsy performed on the 19th day of November, 1917, what in your opinion would you say was the proximate cause of the death of Fay Hamilton?"

He replied that,

"I believe the proximate cause is that thing which necessitated the treatment and which produced the miscarriage and the infection afterwards, namely the introduction of a catheter into the uterus of a pregnant woman."

The questions complained of fairly summarized the facts which the state's evidence tended to prove. The assignment is not meritorious. As we said in *Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626:

"True the question embodied the very fact that was ultimately to be found by the jury, but this does not render it incompetent. To reach their final conclusion the jury were compelled to draw an inference from the facts proven which involved a question of medical science; that is to say, after all of the facts had been

given in evidence, it was still a question whether the disease could be communicated in the manner recited, and as that question involved a matter of medical science, it was proper to submit to the jury on the question the opinion of an expert versed in that science.''

Contention is also made that it was prejudicial error for the court to refuse permission to exhibit to the jury the proven signature of the deceased to the dying declaration. This admitted evidence was desired as tending in some degree to show the physical and mental condition of the girl at the time of the declaration. While this, standing alone, may not be so weighty and prejudicial as to constitute reversible error, yet as the case must be remanded for a new trial on another ground, for the guidance of the trial court in case another trial is had, it is advised that appellant was entitled to display to the jury the signature of the deceased, inasmuch as that signature was on a sheet of paper separate and apart from the declaration itself and could not in anywise confuse the jury. While the value of such evidence to the appellant is doubtful, yet she was within her rights in insisting that the signature be shown to the jury. This is no impingement of the rule announced by this court in *State v. Moody,* 18 Wash. 165, 176, 51 Pac. 356, that it is error to permit the dying declaration of deceased to go to the jury room for investigation by the jury.

Appellant insists that her motion for a new trial should have been sustained. She offered in support of the motion affidavits, which were not controverted, that the testimony of the girl's mother that she was not at the sanitarium prior to November 11 and did not accompany her daughter to the hospital the preceding Friday was false. It is practically admitted here that her testimony in this regard was untruthful.

''Where there was no reason to suspect certain testimony to be perjured, and no laches is shown, the courts will generally grant a new trial if, after the trial, evidence of its perjured character is discovered, and it is as to a material issue, or the verdict is based principally on such testimony.'' 20 R. C. L., p. 299.

Mrs. Hamilton, the mother of the girl, sat in the court room during the whole of the trial, while other witnesses were excluded. In her testimony she testified that, so far as she knew, the health of her daughter was good up to the time she went to the Williams' Sanitarium; that she knew nothing of her going there; that she was not with her when she went. One of the affidavits offered by appellant in support of her motion for new trial as to newly discovered evidence, was that of Mrs. Maude Hindes, a neighbor and friend of the Hamiltons, who was present at the time of the dying declaration of Fay Hamilton and who signed the instrument written by Dr. Sutherland as a witness, and testified at the trial as a witness for the state that she witnessed the dying declaration. It was not discovered until after the trial that she herself was the woman who went with Mrs. Hamilton and Fay to the Williams' Sanitarium on Friday, November 9, and that she did so at the request of Mrs. Hamilton and Fay. This naturally tends to show that Mrs. Hamilton knew, on November 9, that Fay was not in good health, the nature of her condition and her purpose in going to the Williams' Sanitarium, and this testimony was concealed, or at least not produced by the state at the trial. There was no evidence whatever that appellant had used an instrument upon the girl at her office down town, as sought to be established circumstantially and argued to the jury by the prosecution, but in the dying declaration as written by Dr. Sutherland, there was the statement that Mrs. Swartz ''used a catheter. This was out at the nurse's place on Broadway and Elm''

(referring to the Williams' Sanitarium). The only time this could have taken place was Friday, November 9. At that time the mother of the girl and Mrs. Hindes were with the girl all the time that appellant was present after the girl arrived there, and Mrs. Hindes, in her affidavit introduced on the motion for new trial, deposed that no instrument of any kind was used while she was there, and that she would not have permitted any such use. If this last statement is true, then Mrs. Swartz could not have used the instrument at the time stated, and appellant was entitled to a new trial for the purpose of introducing that evidence, together with other evidence that had been discovered after the trial, as shown by affidavits in the record, as to facts of which she had no knowledge prior to the trial, tending to show her innocence. Had Mrs. Hamilton testified to the truth, or not testified at all, the jury might have reached a different conclusion. The testimony of Mrs. Hindes was not merely cumulative. It was the disclosure of a witness to a very material fact favorable to the defense, of which the defense was ignorant, and was contradictory of material evidence by one of the principal witnesses for the prosecution. The credibility of the whole thereof is a question for the jury.

For these reasons, we are convinced that the court abused its discretion in denying a new trial.

Other errors are assigned by appellant, some of which are near akin to prejudicial error, but in view of the fact that the case is reversed and remanded for a new trial, they will probably not arise upon a retrial of the case, and we are not inclined to discuss and pass upon the same.

For the reasons heretofore stated, the judgment is reversed and the case remanded for a new trial.

Fullerton, Mount, Parker, and Bridges, JJ., concur.