[No. 1092. Decided February 23, 1894.]

# THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM C. EDDON, *Appellant*.

HOMICIDE — EVIDENCE — GOOD CHARACTER OF DECEASED — DYING DECLARATIONS — WEIGHT OF — PEREMPTORY CHALLENGES TO JURORS — METHOD OF EXERCISING.

In a prosecution for homicide it is not competent to show the peaceable disposition or character of the deceased, or his good reputation, unless it has been assailed by the defense, although proof of the good character of the defendant may have been put in evidence. (HOYT and SCOTT, JJ., dissent.)

The dying declaration of deceased calling witnesses to note the fact that he was unarmed is inadmissible as a part of the *res gestæ*.

An instruction that when dying declarations are before the jury they are to be treated as the other evidence in the case, is erroneous, as the same weight should not be attached to such testimony as to that of witnesses who can be subjected to cross-examination.

Construing all the statutory provisions together on the subject of challenges to jurors, the defendant must, in a prosecution for homicide, exercise two peremptory challenges to one by the state, until the twelve and six peremptory challenges allowed them respectively are exhausted.

*Appeal from Superior Court, Lincoln County.*

*Thomas C. Griffitts*, for appellant.

*C. H. Neal*, Prosecuting Attorney, and *J. W. Merritt*, for The State.

The opinion of the court was delivered by

DUNBAR, C. J.—At the time of the transaction out of which this trial grows, the defendant, William C. Eddon, was a resident of the town of Sprague. He owned a stock ranch about forty miles from Sprague, then in possession of Eddon's tenant, one Samuel Carlton. The day previous to the shooting Eddon had come to the ranch and remained over night at his tenant's house. The shooting

took place early in the morning of the 1st day of July, 1892. Adjoining this farm one Peter Meyers lived. Meyers had foreclosed a mortgage which he held on the ranch occupied by Carlton and owned by Eddon, and at the foreclosure sale bought the ranch himself. Eddon would not yield possession and out of this the controversy grew.

The testimony shows that on the morning of the shooting Meyers, with his hired man, John Burfine, in passing from his home to some point of destination beyond, went near that portion of the Eddon ranch where the stable was situated. They had gotten past the house some little distance when Meyers turned his horse and rode back to a point in the lane opposite the stable, and called to Carlton whom he saw, asking him if Eddon was there, Eddon being then in the barn. Carlton replied that he was, whereupon Meyers said: "Tell the damn, dirty, low-flung son-of-a-bitch to come out here. I want to see him." Carlton testifies that he told Eddon that Meyers wanted to see him, not repeating to him the violent language which Meyers used. This information being imparted to him, Eddon went out. Meyers, upon seeing him, commenced using violent and abusive language, threatening to thrash him, etc., and calling him the name above mentioned. Meyers descended from his horse and hitched it, and started towards the fence, there being a fence between him and Eddon. Here there is a contradiction in the testimony, Meyers' testimony by dying declaration being, that after he called Eddon a "son-of-a-bitch," Eddon drew his revolver and told him to take it back. He replied that he would not take it back, and told Eddon to put it up. These expressions passed between them two or three times, and Eddon fired, shooting Meyers through the body. While Eddon's version is that Meyers told him to come out there and he would stamp him into the road. Eddon

declared that he would not come, whereupon Meyers insisted that he would go to him, all the time cursing and damning and using violent words and making violent gestures; and he, believing that he was in danger of great bodily harm, fired upon Meyers. The result was that Meyers died within two days. Eddon was arrested and charged with murder in the first degree. Upon the trial he was found guilty of the crime of manslaughter and sentenced to ten years in the penitentiary. From this judgment he appeals to this court.

Various assignments of error are made, two of which we shall discuss. After the testimony of the defense had closed, and without the character of the deceased having been raised or put in question by the defense, the state, on rebuttal, offered evidence tending to establish the reputation of the deceased as a law abiding and peaceable man. It further offered evidence tending to show that Meyers was not in the habit of carrying deadly weapons. There are many authorities holding that it is not competent for the defense to prove the reputation of the deceased as a law abiding and peaceable man; but many others hold that where the question of self-defense is in issue, and where such testimony serves to explain the conduct of the deceased and is, therefore, a part of the *res gestœ*, he can show the bad character and reputation of the deceased as a turbulent, quarrelsome man; and the rule is universal, we think, that when this question is gone into by the defense, the state may rebut such testimony by showing his good character.

There is, unfortunately, no brief filed by the respondent in this case, but from the examination of the cases cited by the appellant, the text books on the subject, and all the information we have been able to gather, we think the universal rule is opposed to the doctrine that the prosecution on a trial for murder, in the first instance and as a part of

their case, can show the character and reputation of the deceased; and if they cannot do this in the opening, much less should they be allowed to go into this question in rebuttal, after the defendant has closed his case.

In *State v. Potter*, 13 Kan. 414, that eminent jurist Judge BREWER, in discussing this proposition, says:

"In such cases it is said that the authorities hold that the defendant may show the bad character and reputation of the deceased as a turbulent, quarrelsome man. And if the defendant may show that the deceased was a known quarrelsome, dangerous man, why may not the state show that he was a known peaceable, quiet citizen? The argument is not good. The books are full of parallel cases. The accused may in some cases show his own good character. The state can never in the first instance show his bad character. A party can never offer evidence to support a witness' credibility until it is attacked. The reasons for these rules are obvious. Such testimony tends to distract the minds of the jury from the principal question, and should only be admitted when absolutely essential to the discovery of the truth. Again, the law presumes that a witness is honest, that a defendant has a good character, and that a party killed was a quiet and peaceable citizen, except so far as the contrary appears from the testimony in the case; and this presumption renders it unnecessary to offer any evidence in support thereof."

It is evident that if the introduction of such testimony is unnecessary, it is liable to have a pernicious influence, as Judge BREWER says, by attracting the minds of the jury to the immaterial evidence and leading their minds from the true issues in the case.

In *Ben* (a slave) *v. State*, 37 Ala. 103, in deciding this question, the court says:

"It has been decided in this state, that the bad character of the deceased is competent evidence for the accused, where the circumstances are such that they would be illustrated by such character. The reason upon which that decision rests is, that the slayer must be reasonably presumed to

act upon the circumstances surrounding him, as they are colored by the bad character of the deceased; and that, therefore, it is but just to the accused that the jury should know that character. We do not think that this reasoning requires us to hold that the state may go into evidence of the peaceable character of the deceased when it is not assailed on the part of the accused. If the character of the deceased was that of a peaceable man, the circumstances may safely be left to speak their own language. It is not requisite to their interpretation that the character should be known.''

Especially can it be seen that the testimony offered in this case to show that Meyers was a man of a peaceable character, and that he was a man who did not carry arms, and never had any fire arms in his possession, was exceedingly prejudicial to the defendant; for there was no attempt made to show that the defendant had any knowledge of Meyers' reputation as a peaceable man, or any knowledge of the fact that he was not in the habit of carrying fire arms; and the logical result of such testimony would be to hold Eddon responsible for acting on the theory that Meyers was the kind and character of a man proven to be, when there is nothing to justify the conclusion that he was aware of Meyers' character in this respect. In other words, the jury would judge Eddon's acts in the light of their knowledge of Meyers' character, instead of in the light of Eddon's knowledge of Meyers' character, in arriving at a conclusion whether or not Eddon was justified in concluding that he was in such danger of great bodily harm as to justify him in shooting him. Of course, the rule is, that he must act as a prudent man would be justified in acting under the circumstances; and to hold him responsible for circumstances of which he was not aware, is plainly an injustice.

''In a prosecution for homicide it is not competent for the prosecution to show the peaceable disposition or char-

acter of the deceased, or his good reputation, except in re-
buttal, when it has been assailed by the defense; for it is to
be presumed, until otherwise shown, that the character, dis-
position or habits of the person killed had no influence
upon the defendant in committing the homicide.'' Kerr,
Homicide, § 420.

In *Pound v. State*, 43 Ga. 88, the court, in passing upon
this question, says:

''When the State of Georgia charges the commission of
crime against the citizen, it is incumbent on the state to
prove the accusation and to rebut, by proper testimony,
matters permitted to be given in evidence for the defense,
but not, in the first instance, to repel the presumption of
the defense before these are put in issue by proof.''

To the same effect, *People v. Anderson*, 39 Cal. 704;
*People v. Bezy*, 67 Cal. 223 (7 Pac. 643), and, in fact, as
we before said, such is the universal holding of the courts
where the question of character is allowed to be introduced
at all.

The state also, over the objection of the defense, intro-
duced the dying declaration of Meyers concerning the
affray. The subject of dying declarations is a difficult one
to adjudicate. The general doctrine is that the full belief
in impending death is the true and only test of admissibility
in evidence of such declarations. The trouble with this
character of evidence is, that it is in its nature hearsay
evidence and is in practical conflict with the constitutional
right of the defendant to meet the witnesses, that testify
against him, face to face; and is in conflict with his right
to cross examine such witnesses; and it is only tolerated on
the ground of necessity growing out of the fact that mur-
derers, by putting the witnesses, who are generally sole
witnesses of the crime, beyond the power of testifying by
killing them, will escape the consequences of their crime.
It can only be justified on the presumption that the solemn
realization of impending and inevitable death will take the

place of the solemnity of an oath; and the greatest care and caution ought, therefore, to be exercised in the admission of this character of testimony.

The books are full of instances where dying declarations have been refused because it did not appear plainly that the person making the declaration was impressed with the fact that there was no hope of his recovery, or that he was not convinced of the near approach of death; while many others have been admitted under practically the same showing. So that it is difficult to obtain any satisfactory information from an investigation of the cases. But taking the general doctrine, held by all authorities, as a basis of admission, viz., the consciousness of immediately approaching death, we think the judge was justified in admitting the declaration, or at least a portion of the declaration, of Meyers proven in this case, though we think it came very near the border line of inadmissibility.

It is argued by appellant that this was a statement made to a newspaper reporter. This seems to be true from the testimony, but while that may affect to a certain extent its credibility, we think it does not necessarily exclude it, as it makes no particular difference, so far as eligibility of the declaration is concerned, to whom it is made. The doctor testifies that he had informed Meyers that the termination would be fatal, and Meyers replied that that was what he thought. It is evident from the circumstance of Meyers having sent for an attorney to draw up his will and to make arrangements for the settlement of his estate and the disposition of his property, that his mind was running upon his death, and that he was apprehensive that the dissolution was rapidly approaching, for he told the lawyer, just before the statement was made, that they had better hurry up the business concerning the will, for he did not know how long they might have to attend to it in. And without reviewing all the circumstances, we think we would

not be justified in excluding this statement. Inasmuch as we desire to comment upon this statement in another branch of the law, we will set it out here:

"'He said he was going out near Ritzville to see about some stock of some kind. He was on a horse, and in going by saw that the fence was down. (Objection.) Saw the fence was down and went back to see Mr. Carlton, a gentleman living on the place. That the fence was in a bad condition, and have him fix it. As he rode in the lane he thought he saw Mr. Eddon through an opening in the log stable. He asked Carlton if that was Eddon. He replied that it was; and he said to tell him (calling him a name) to come out there.

"*Mr. Griffitts:* Tell what the witness said. *A.* Said, 'Tell the son-of-a-bitch to come out here. I want to see him.' He stated that he came out of the stable and came towards him, and, as he came around before the stable, drew a gun and says, 'Take that back.' Mr. Meyers said, 'Put it up,' and he said, 'Take it back;' and Meyers said, 'Put it up' three times. Advanced to the fence and laid either his hand or the gun on the fence and shot him.''

"Q. Was that the substance of all that he told you of the occurrence? A. After he was shot he put his hand back and thought he could feel the bullet or something back—put his hand back to see what it was, and at that I believe he fell or settled to the ground. That after he had settled to the ground he called his hired man that was near by, and Mr. Carlton examined him to see if he was unarmed.''

This last portion of the statement we think was inadmissible, as it was no part of the *res gestæ*, and we do not think the statement of what he did after the shooting, which was in the nature of obtaining testimony that he was not armed at the time of the difficulty, should have been allowed under any authority as a part of the dying declaration; for the admission of dying declarations in cases of homicide is thus formulated by 1 Greenleaf, Evidence, §156: The death of the deceased is the subject of the charge, and the circumstances of the death are the subject

of the dying declarations. It seems to us that the portion
of this statement in reference to calling witnesses to see
whether or not Myers had any arms, after the affray had
ceased, was no part of the circumstances of the death; and
the same may be said of the first part of the statement,
with reference to the reason for his going to the place
where the difficulty occurred.

The instruction, and the whole instruction, of the court
on the subject of dying declarations was as follows:

"Dying declarations as to the circumstances under
which a mortal wound was received are admitted as evi-
dence upon the theory that when the deceased made them
he was in expectation of speedy dissolution or impending
death, and that the solemnity of his situation impresses
him as strongly with the necessity of strict truthfulness as
he would be impressed by the obligation of a judicial oath,
and that under these circumstances the temptation or in-
ducement to falsehood is removed. In other words, his
situation places him in law upon the same footing as
though he had been sworn and had made his statement in
the case, and his dying declarations are to have no greater
weight than if the deceased were alive and testified to the
same facts upon the witness stand. So that when the
dying declarations are before the jury, as in this case, they
are to be treated as the other evidence in the case, and to
be considered with such evidence in determining the issues
in the case. Like all of the evidence, the jury is to de-
termine the weight which they shall have, and this the
jury will give to the dying declarations from a full consid-
eration of all the facts and circumstances surrounding
them."

To this instruction the defendant excepted. It is true
that there is a line of authorities under which this instruc-
tion of the court could be sustained, but there is another
line of authorities which hold that the dying declaration
does not stand upon the same footing, and should not have
the same weight as the testimony of a person who is sworn
in the case. It is true that a dying declaration is made

competent testimony, as we have before said, from necessity; but it seems to us that the most that can be said is that the solemn thought of impending death only takes the place of the solemn oath which is administered to a witness in court, and that no greater weight should be given to a dying declaration than that which would be given to sworn testimony when no opportunity was given for a cross-examination.

It is the experience of every court and every lawyer that cross-examination is the most powerful instrument known to the law in eliciting truth or in discovering error in statements made in chief, whether that error arise from mistaken judgment and careless observation and expression, or from a corrupt desire and intention to pervert the truth. The defendant is deprived of this aid, which the law guarantees to him in cases where witnesses testify in open court; and, notwithstanding the fact that the witness may believe that he is about to be ushered into eternity, yet observation teaches that even this solemn fact does not always disabuse a person's mind of his prejudices, or even eradicate a vindictive or revengeful feeling. Many persons have been known to die with the most bitter curses and imprecations on their lips; and even in this case it is testified by the witnesses who heard the last statement, that while Meyers was making his dying statement, when he referred to Eddon he applied to him the most opprobious, disgraceful and insulting epithets; that he asked his wife to see that justice was done him, and that she told him that she would if she had to live on bread and water; showing conclusively that the spirit of reconciliation and forgiveness did not exist in the mind of the deceased at the time that he was making the statement, and that he was still somewhat influenced by feelings of revenge against his slayer.

From the further fact, that the testimony comes through

the medium of others, making another remove from testimony as given in court, the chances of misunderstanding just what was said, or intended to be said or meant, by the person making the statement, making allowance for lack of expression in the uttering of sentences, and the fact that a sentence uttered in one tone and with one expression may convey one meaning and in another tone and with another expression or gesture or look, would convey another and different meaning — it seems to us, taking all these things into consideration, that the instruction that the statement should receive the same weight as the statement of a witness under oath, is too broad, and is liable to work injustice to the defendant.    And in this view we are sustained, we think, by the weight of modern authority.    The rule is thus stated by Kerr on the Law of Homicide, § 415:

"The theory upon which dying declarations, being mere hearsay, are made admissible is that when an individual is in constant expectation of impending death, all temptation or inducement to falsehood is removed, and the solemnity of his situation is supposed to impress him as strongly with the necessity of strict truthfulness as the obligation of a judicial oath; but the circumstances attending and immediately surrounding the making of such declarations — the absence of all cross questioning, the presence, usually, of only friends and sympathizers, whose interest in the affair is identified with that of the deceased — together with the likelihood of feebleness of mind and misunderstanding, all create an element of uncertainty as to the proper weight of such declarations, which necessarily makes the degree of such weight a question of fact in each particular case; and it is error to instruct the jury that the credibility of the dying declarations is to be measured by the weight which the testimony of the declarant would have received had he been present and testified at the trial."

In *State v. Mathes*, 90 Mo. 571 (2 S. W. 800), it was decided:

"An instruction, that dying declarations given in evidence on the part of the state are to be received with the

same degree of credit as if testified to under oath on examination, is erroneous."

"Dying declarations are in their nature secondary evidence, and are so regarded in the law. It is, therefore, error to instruct a jury to give them the same weight they would if the declarant had testified before them." *State v. Vansant,* 80 Mo. 67.

In discussing this question the court in that case said:

"It is true that in some of the authorities the admissibility of dying declarations is put upon the ground that 'the persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn, the danger of impending death being equivalent to the sanction of an oath.' (Greenleaf, Ev., § 157.) It is to be remembered, however, in weighing such testimony that feelings of animosity and illwill once aroused are not always allayed, and that the passion of anger attending the fatal occurrence itself is not always extinguished even by the consciousness of impending death; and it is also to be remembered that the accused is deprived of all power of cross examination, 'a power quite as essential to the eliciting of all the truth as the obligation of an oath can be.' Besides such declarations are afflicted with the common infirmity which attaches to all oral statements or verbal admissions reduced to writing or repeated by another, and are liable to be colored or deflected by the medium through which they are transmitted to the jury."

Mr. Wharton, in his work on Criminal Evidence, § 276, in discussing this subject, says:

"Yet, in dealing with this kind of evidence, one or two preliminary cautions should be observed. Passions and prejudices, which in life pervert the perceptive faculties, do not always lose their power on the death bed. . . . It should be remembered that cross examination, when a witness is produced in court, gives a process by which delusions can be dissipated. But no such process exists by the death bed. The witnesses who catch up these statements are generally friends of and sympathizers with the dying man, eager to encourage and preserve any remarks

he may drop, no matter how incoherent or feverish, which may vindicate him, or implicate a common object of hate; nor by such witnesses is it likely that questions would be asked as to the grounds of the declarant's belief. Nor can it always be said that the consciousness of the near approach of death is an equivalent to an oath administered on the witness stand. A witness sworn in court knows that he may be convicted of perjury if he testifies falsely. A dying man, if he believes in a future retribution, will speak, if his faculties are unimpaired, under a similar sanction; but all dying men do not retain their faculties unimpaired, nor do all dying men believe in a future state of retribution. Convicts on the scaffold have, as a class, as little hope of reprieve as any persons on the eve of death; yet there is no kind of evidence so unreliable as the last speeches of convicts on the scaffold. The weight, therefore, to be attached to dying declarations depend upon these conditions: (1) The trustworthiness of the reporters; (2) the capacity of the declarant at the time to remember accurately the past; and (3) his disposition truly to tell what he remembers."

It seems to us that under the circumstances of this case, and in fact under the circumstances of any case, the court ought to have, outside of the error of instructing the jury that the dying declaration should have the same weight as testimony under oath, called the attention of the jury more specifically to these matters spoken of by Mr. Wharton, which could attest the truthfulness of the statement.

The same doctrine announced above was held in *State v. McCanon*, 51 Mo. 160, and in *Lambeth v. State*, 23 Miss. 358, and is thus commented on in Rorer's Crim. Ev., p. 38:

"With respect to the effect of dying declarations, it is to be observed that, although there may have been an utter abandonment of all hope of recovery, it will often happen that the particulars of the violence to which the deceased has spoken were likely to have occurred under circumstances of confusion and surprise calculated to prevent their being accurately observed. The consequences, also, of the violence may occasion an injury to the mind, and an

indistinctness of memory as to the particular transaction. The deceased may have stated his inferences from facts, concerning which he may have drawn a wrong conclusion, or he may have omitted important particulars from not having his attention called to them. Such evidence, therefore, is liable to be very incomplete. He may naturally, also, be disposed to give a partial account of the occurrence; although possibly not influenced by animosity or ill-will. But it cannot be concealed that animosity and resentment are not unlikely to be felt in such a situation. The passion of anger once excited may not have been entirely extinguished, even when all hope of life is lost. . . .

"Such considerations show the necessity of caution in receiving impressions from accounts given by persons in a dying state; especially when it is considered that they cannot be subjected to the power of cross examination; a power quite as necessary for securing the truth as the religious obligation of an oath can be."

In view of all these doubts which are practically raised as to the grounds of the statement made by the declarant, we think it is going too far to say that it should go to the jury with the same weight as the testimony of a sworn witness who can be subjected to a truth-eliciting cross examination; and that the logic of all the cases only leads us to the extent of declaring that the testimony should be received with the same weight as the testimony of witnesses who cannot be subjected to cross examination. That this is a circumstance which the jury have a right to take into consideration in weighing the testimony.

There is another assignment of error which raises a question of practice, or rather of procedure, which ought to be settled, to the end that a uniform practice may be adopted in the trial of criminal causes.

In selecting the jury, the court compelled the defendant, over his objection, to exercise two peremptory challenges to one by the state, until the peremptory challenges were exhausted. Sec. 348 of the Code of Procedure provides,

among other things relating to peremptory challenges, that the plaintiff may challenge one and the defendant may challenge one, and so, alternately, until the peremptory challenges shall be exhausted. This proceeding is found in the civil practice act. Sec. 1297 provides that the law relating to drawing, retaining and selecting jurors, and trials by jury in civil cases, shall be applied to criminal cases.

Our first impression was that this assignment was meritorious, and that the language of the statute was not susceptible of construction; but on further consideration it is plain that construction is absolutely necessary, for inasmuch as the defendant has twelve challenges and the state but six, there cannot be such a thing as alternate challenge of one on a side until the challenges are exhausted, for there comes a time before the exhaustion of the challenges when the alternation must of necessity cease; and the literal construction of this statute would have the effect of depriving the defendant of the last six challenges. The seeming inconsistency comes from the fact that the mode of challenge was enacted with reference to civil actions, on the supposition that the number of challenges were equal, and without reference to the excess of challenges allowed the defendant; and it is evident that this excess was not taken into consideration by the legislature when the law in relation to the selecting of jurors in civil actions was made applicable to criminal causes.

The different provisions of the law, then, being of doubtful meaning, and inconsistent, so far as their practical application is concerned, with themselves, we must construe all the acts together, looking at the spirit and reason of the law, and to the reasonable application of each act to the other, and give them that construction, if possible, which will render all the different provisions harmonious and operative. To do this, it must be confessed that a

seeming violence is done to some of the words used in § 348, and if that section were to be construed alone, it would be an *actual* violence. But in consideration of all the different sections, we think each should receive, if fairly susceptible of it, such a construction as would carry out a reasonable intention on the part of the legislature. Therefore, the conclusion we reach, from a consideration of all the dependent acts, is, that the legislature only intended to give the defendant twice the number of challenges that were given to the state, to be exercised alternately in proportion to the number of challenges respectively given; and that it did not intend to give the defendant the additional advantage of having seven peremptory challenges left after the state had exhausted all its challenges; a result which it seems to us would unfairly imperil the rights of the state and cripple courts in administering the laws.

Many other errors are assigned, but we think they are not sufficient to warrant a reversal of the judgment. But for the errors above discussed, the judgment will be reversed and the cause remanded to the lower court with instructions to grant a new trial.

STILES and ANDERS, JJ., concur.

HOYT, J. (*dissenting*).—I think the testimony taken altogether so clearly established the fact that the defendant was guilty of manslaughter, that the jury could not have found otherwise than as they did. For this reason the judgment should not be reversed even although it appeared that some technical error had been committed by the court during the progress of the trial. Such being the case, I do not think it necessary to discuss the argument and conclusion of the majority of the court as to many of the questions decided.

There is one, however, as to which I wish to say a word,

and that is as to the right of the prosecution to introduce evidence as to the good character of the deceased by way of rebuttal, when the good character of the defendant has been testified to by witnesses introduced on his behalf. I am aware that the weight of authority is with the position taken by the majority, but I cannot yield my assent to the doctrine announced by them. Under the rules which obtain as to the trial of criminal actions in modern times some of the old fictions in relation to the rights of the defendant must be discarded, or the failure of justice will be such as to bring disgrace upon the administration of the law. At the time most of these technical rules were established the defendant was practically at the mercy of the court, and it was right that he should be protected in every way possible; but at this time the defendant goes to trial under entirely different circumstances, and there is no reason why the rules relating to such trials should not be substantially the same as those obtaining in civil cases, excepting that to avoid the possibility of an innocent man being convicted the guilt of a defendant should be made to appear beyond a reasonable doubt before a verdict should be rendered against him.

When, as in the case at bar, the killing by the defendant is admitted, and the plea of self-defense interposed, the jury should be put in possession of every fact surrounding the transaction, and if the character of the defendant is allowed to go before them as a part thereof, fairness and reason require that they should also be informed as to the character of the deceased. The important and frequently the only question which they have to decide in such a case is, as to which of the parties was the aggressor in the affray. If in fact the defendant was the aggressor, he should under ordinary circumstances be found guilty at least of manslaughter, and if the deceased party was the aggressor, the jury would generally be justified in acquitting the defendant.

The important question to be determined is, as to which of the two persons engaged in the affray was the aggressor. And if the jury are to be aided by having the good character of one of the parties to such affray put in evidence, fairness to the public requires that they should be further aided by being informed as to the good character of the other party.    And as evidence of the good character of the defendant is admitted without proof of any knowledge in regard thereto by the deceased party, no such proof should be required to make competent like evidence as to his good character.    In my opinion the judgment should be affirmed.

SCOTT, J., concurs.