[No. 23008. Department Two. July 23, 1931.]

THE STATE OF WASHINGTON, *Respondent*, v. HARRY LONG, *Appellant*.[1]

*Edward M. Connelly* and *Joseph J. Lavin,* for appellant.

*Chas. W. Greenough* and *Louis F. Bunge,* for respondent.

[1]Reported in 1 P. (2d) 844.

608

TOLMAN, C. J.—The appellant (defendant below) was charged with the crime of murder in the first degree. To the information he pleaded not guilty, and also filed a special plea of mental irresponsibility at the time set forth in the information, to the extent that he did not understand or realize the nature of his acts, and that he has since become mentally responsible and sane.

A trial to a jury resulted in a verdict of guilty of murder in the first degree, but the jury found against the infliction of the death penalty. From a judgment on the verdict, sentencing him to confinement at hard labor in the penitentiary for the period of his natural life, this appeal is prosecuted.

The principal errors assigned, and all that require discussion here, are directed to the admission in evidence of the dying declaration of the victim, the instruction given by the court with reference to the evidentiary value of the dying declaration, and the instruction given on mental irresponsibility or insanity.

We shall confine ourselves to these assignments, giving as little as possible of the harrowing details which were necessarily put before the jury.

The dying declaration appears to have been made under conditions justifying its admission in evidence, and no error is assigned in that respect. The objections urged are that it contains matters not proper to be admitted, that it is a self-made certificate of good character, and that it contains conclusions, inferences and recitals which are wholly inadmissible as a part of such a declaration, under the great weight of authority. The declaration, as admitted, is as follows:

"State of Washington) ss.
"County of Spokane ∫

"Myrtle Long being duly sworn upon oath says: My true name is Myrtle Long. I live with my husband

Harry Long and my two children at N. 2814 Dakota St., in the city of Spokane. My husband and I have been married seventeen years, and until recently got along as well as most married people. During the past three weeks my husband seemed to become very jealous of me. I have been working at the Alaska Junk Co., sewing sacks while my husband has been out of employment since before Christmas. I have a practice of riding down town in the mornings with Mr. Lou Fahey who lives, with his wife and family, across the street from us. Mr. and Mrs. Fahey and my husband and I have also frequently gone to parties together. My husband believed that there was something between Mr. Fahey and myself, but he was entirely mistaken in this belief. He has several times accused me of being in love with Mr. Fahey. It was so preposterous that I did not take the trouble to deny it. I have been afraid of my husband for some time, as my daughter and I both knew, or rather felt, that he had a gun. Last night Mr. and Mrs. Fahey, my husband, myself and our daughter and girl friend went to the dance at Carpenters Hall. We danced until about midnight when we all went over to Fahey's home for lunch. We finally got to bed about two o'clock this morning. My husband began accusing me of being too friendly with Mr. Fahey. He told me that he would fill Fahey full of lead before he would permit him to have me. I tried to reason with him but it was no use. He seemed to become more enraged the more I talked with him. Finally he jumped on my back as I was lying in bed on my stomach and commenced to beat me on the back of the neck and head. He grabbed his gun from some hiding place and shot me four times. I was conscious at all times after he shot me until I arrived at the hospital, and talked with Mrs. Fahey, who came in response to my daughter's calls. I make this statement fully conscious, and with the belief that I will not recover from my wounds, and I further feel that I will not be here tomorrow morning. Dated January 14, 1930.

(Signed) "Myrtle Long."

The general rule as to what is admissible as a dying declaration seems to be well stated in 1 R. C. L. 533:

"Dying declarations are not, however, admissible where they consist of statements of facts or circumstances not immediately connected with the act of killing, but relate to previous distinct transactions, though they may have reference to occurrences which disclose a motive or provocation for the killing or which show a state of hostility existing between the parties."

And, again, at page 535 in the same volume, it is said:

"It is a rule of general application that statements of facts and circumstances not immediately connected with the act of killing, but relating to previous distinct transactions, are not admissible as dying declarations. For declarations which relate to such transactions do not come within the principle of necessity on which such declarations are received. Therefore dying declarations by the injured party as to previous threats made by the accused, or as to previous attempts made on the declarant's life by the accused, are not admissible, for the declarant does not become a general witness. He can only speak of the transaction which caused the death, and such accompanying acts, statements, and conduct as shed light on it; the *res gestae*, in a strict sense. Anything previously done or said, unless called up and made a part of the altercation, cannot be proven as a dying declaration; and when so called up it can be proved as such only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement, done or uttered at the time of the final fatal encounter and catastrophe, and which tend to shed light on it as a part of the *res gestae*, which can be so proved."

This court recognized this rule in *State v. Eddon*, 8 Wash. 292, 36 Pac. 139, there holding that what oc-

curred after the shooting was no part of the *res gestae* and was not admissible.

Also in *State v. Swartz,* 108 Wash. 21, 182 Pac. 953, in discussing such a declaration, the court said, after quoting certain language from the statement:

". . . all clearly relate to the acts of another than the accused, with whom she was in no way connected, form no part of the *res gestae,* or declarations as to the acts and conduct of the accused, and were clearly improper. They should have been stricken. We cannot consider them as having been presumptively prejudicial to the appellant and would not reverse the judgment upon the admission of them alone. Upon a new trial, however, the above portion should be excluded.

" 'Dying declarations are statements of material facts concerning the cause and circumstances of the homicide. . . . They are restricted to the act of killing, and to the circumstances attending it, and form part of the *res gestae.* When· they relate to former and distinct transactions, and embrace facts or circumstances not immediately connected with the declarant's death, they are inadmissible.' *State v. Baldwin,* 79 Iowa 714, 45 N. W. 297.

"Facts, and not conclusions, opinions or inferences, are admissible as dying declarations, just as in non-expert testimony of a living witness, and more particularly so because the deceased cannot be observed or subjected to cross-examination. *Montgomery v. State,* 80 Ind. 338, 41 Am. Rep. 815; *State v. Center,* 35 Vt. 277; *State v. Eddon,* 8 Wash. 292, 36 Pac. 139; 1 Greenleaf, Evidence, § 156.''

A considerable portion of the criticized language in the declaration now before us was not particularly prejudicial, in view of the nature of the defense offered; but that defense was founded on the appellant's testimony to the effect that, his wife having admitted to him (or rather boasted) that she had been criminally intimate with another, and was then pregnant by such·

other, his mind thereupon gave way completely, and he had no knowledge, recollection or remembrance of any act or acts performed thereafter, and that he had no consciousness of anything which occurred until he came to himself in the hospital in a wounded condition hours after the shooting.

This testimony was for the jury to weigh in the light of all of the other facts and circumstances shown; and that being true, there were other parts of the declaration which were extremely prejudicial to the appellant. We see no reason for admitting in evidence any more of the declaration than the following:

"My true name is Myrtle Long. I live with my husband Harry Long . . . at N. 2814 Dakota St., in the city of Spokane. . . . We finally got to bed about two o'clock this morning. My husband began accusing me of being too friendly with Mr. Fahey. He told me that he would fill Fahey full of lead before he would permit him to have me. I tried to reason with him but it was no use. He seemed to become more enraged the more I talked with him. Finally he jumped on my back as I was lying in bed on my stomach, and commenced to beat me on the back of the neck and head. He grabbed his gun from some hiding place and shot me four times. . . . I make this statement fully conscious, and with the belief that I will not recover from my wounds, and I further feel that I will not be here tomorrow morning. Dated January 14, 1930.                    (Signed) "Myrtle Long."

On the subject of dying declarations, the court instructed:

"You are instructed that in prosecutions for murder or homicide, dying declarations of the person with whose murder the accused stands charged, when material and made under the sense of impending death, are admissible in evidence. Such declarations are made when the party making them is at the point of death, and when every hope of the world is gone, and when every motive for falsehood is silenced and the

mind is induced by the most powerful considerations to speak the truth. The situation in law is considered as creating an obligation equal to that which is imposed by an oath administered in a court of justice, but the truth or falsity of such declaration and the degree of inaccuracy in the recital thereof by the witness are matters for you to weigh under the same tests as applied to other witnesses, considering all the circumstances in evidence surrounding the case and the witness.''

We think this instruction is erroneous because it is a comment on the weight of the evidence, because it tells the jury that every motive for falsehood is silenced and because it places such evidence on a parity with, if not above, the testimony of other witnesses produced in person, placed under oath and subjected to cross-examination.

In *State v. Eddon, supra,* a far less prejudicial instruction on this subject was held to be erroneous. Judge Dunbar, then speaking for the court, in effect said the general doctrine is that full belief in impending death makes this class of evidence admissible because that belief takes the place of the usual oath, but, though admissible, the defendant is deprived of his constitutional right to meet the witness face to face and of the right of cross-examination. Therefore no greater weight should be given to such a declaration than would be given to any other sworn testimony as to which there was no opportunity to cross-examine.

That portion of the instruction which says,

''Such declarations are made when the party making them is at the point of death, and when every hope of the world is gone, and when every motive for falsehood is silenced,''

is particularly unfortunate. Even under such circumstances, the victim may be fired by a spirit of revenge, or, as may have been the case here, have had the

strongest possible reasons for leaving an untarnished reputation in the eyes of the world, so that her innocent children might maintain their belief in, and their respect for, the memory of a virtuous mother. The purpose and intent of the declarant (and of every other witness) is peculiarly a question for the jury. We think the *Eddon* case clearly defines what is proper in such an instruction, and no further definition is now required.

■ The instruction on insanity or mental irresponsibility is unduly long and involved, covering three and one-half closely-typewritten pages. While it contains many proper expressions of the law, it also contains some which are improper, and such as were specifically condemned in *State v. Craig,* 52 Wash. 66, 100 Pac. 167. The instruction, taken as a whole, could hardly be other than confusing to the jury by reason of its inconsistent and contradictory statements.

With the matters contained in instruction No. 7½ as introductory, the jury should have been told in simple, direct language that the sole question in that respect for them to decide was, Did the accused have sufficient mental capacity at the time of the commission of the act complained of to comprehend what he was doing, and to distinguish right from wrong, with reference to the particular act or acts with which he was charged? This, we think, should have been entirely sufficient, and would have brought home to the jury the one controlling issue which it was their duty to determine.

We are not particularly impressed with the defense of insanity here presented, and are satisfied that the facts justified the verdict. Yet, because of the errors we have pointed out, the appellant was deprived of a fair trial. In the absence of such errors, the jury might have found the appellant to have been insane,

or, even though disbelieving in the insanity, still might very well have found a verdict of murder in the second degree.

The judgment is reversed, with instructions to grant a new trial.

MAIN, MILLARD, BEELER, and BEALS, JJ., concur.