[No. 23854.  Department One.  September 20, 1932.]

THE STATE OF WASHINGTON, *Respondent*, v. LEO BEZEMER, *Appellant.*[1]

[1]Reported in 14 P. (2d) 460.

560

*James P. Neal* and *Fred M. Bond,* for appellant.

*John I. O'Phelan* and *John J. Langenbach,* for respondent.

STEINERT, J.—The defendant was prosecuted in the court below for the crime of murder in the first degree. The jury returned a verdict of guilt, but specially found that the death penalty should not be inflicted. The court by its judgment imposed a sentence of life imprisonment in the penitentiary. The defendant has appealed.

The information, omitting its formal parts, reads as follows:

"That he, the said Leo Bezemer, on or about the 19th day of August, 1931, in Pacific County, Washington, then and there being, did then and there with a pre-meditated design to effect the death of Robert Carlson, and without any excuse or justification, willfully, unlawfully, wrongfully and feloniously stab and cut the said Robert Carlson with a knife which he, the said Leo Bezemer, then and there held in his hand and said Leo Bezemer did thus and thereby then and there kill and murder the said Robert Carlson and from the effect of such stabbing and cutting the said Robert Carlson did die on the 20th day of August, 1931, contrary to the form of the statute, etc."

The facts, as disclosed principally by the evidence for the appellant, are substantially these: The deceased, Robert Carlson, and the appellant were neighbors, living on adjoining farms. Carlson, a married man, was about thirty years of age, was about five feet eleven inches in height, weighed about one hundred and seventy-five pounds, and was very muscular and agile. The appellant, an unmarried man, was about fifty years of age, was about five feet nine inches in height, and weighed about one hundred and forty-five pounds. He lived alone on a farm owned by his father,

K. Bezemer, on which he was employed in raising vegetables for the market. Carlson lived on an adjoining farm, and in connection with its operation owned and kept a number of blooded cows.

Carlson and the appellant had known each other for seven or eight years, and had had the usual contacts of neighbors, although they were not particularly intimate in their association with each other. Carlson had also owned a dog, which had been poisoned, however, by some unknown person shortly before August 19, 1930. Carlson suspected that the appellant or the appellant's father was responsible for the poisoning. On the Sunday preceding August 19, while appellant was driving his horse along the road in front of Carlson's home, the latter accosted and, in a very belligerant manner, accused appellant of having poisoned the dog. The appellant protested his innocence of the deed and likewise his friendship for Carlson, but succeeded only partially in mollifying the latter's anger.

So far as the record discloses, the two men do not seem to have had any further contact with each other between the time of that occurrence and August 19. On the latter date, about five o'clock in the afternoon, Carlson went out to herd his cows and bring them home. He found them on appellant's land. They had evidently made their ingress upon the Bezemer farm through a wire fence which ran along one side of it, adjacent to the Carlson property. The fence consisted of strained wire fastened to a series of posts and stumps. A gateway had been fashioned by detaching the wires from one of the posts or stumps and fastening them to a movable stake or post which could be adjusted at will. In this way, the so-called "Arizona gate" could be held in place as a part of the fence or swung open, as occasion required.

Shortly before the date mentioned above, appellant had cut the wires from one of the posts near the gate, thus leaving a gap in the fence. The exact time of the cutting is, according to the evidence, a matter in dispute. Appellant testified that, for convenience of exit and return, he had cut the wires two or three weeks before August 19, intending to make, or re-establish, the gate at that point. Evidence by the state tended to show that the cutting was done on or shortly before August 19. In the vicinity of the gate were many trees and much underbrush of varying height and density.

Seeing the cattle in his field, appellant left his home and proceeded toward the fence, intending to drive them out. He did not, however, at that time see Carlson or know that he was in the immediate vicinity. As the appellant emerged from the thicket of trees and underbrush, he saw Carlson holding on to one of the cows and, with a stick or club in his hand, attempting to steer or drive the herd through the opening. Appellant approached with the intention of offering assistance. Carlson, on looking up and seeing the appellant, released his hold on the cow, and a verbal altercation regarding the fence and its condition immediately ensued between the two men.

According to the appellant, the altercation was initiated by Carlson, during which he made a lunge at the appellant and struck at him with the stick in his hand. Appellant darted under Carlson's arm as the blow fell, and as a result of the clash between the two men, the stick "fulcrumed" out of Carlson's hand. At about the same time, appellant struck Carlson in the face with his fist, though somewhat awkwardly and weakly. The men grappled, fell and rolled upon the ground, Carlson finally landing on top of the appellant. Carlson then began administering blows upon

the appellant, pulling his hair and pounding his head upon the ground, at the same time threatening to kill him. Appellant drew himself as far down underneath Carlson as he could and with his left arm endeavored to hold Carlson close to him and in this way interfere with the blows being rained upon him.

Knowing that he was no match for his assailant, and feeling that his strength was fast leaving him, appellant reached for his vegetable knife, which had an open blade about four and a half inches long and one or one and a half inches wide, and which he carried in his righthand pants' pocket. After warning Carlson that he would use the knife unless he was released, appellant began to stick Carlson in the back over and about the left shoulder. These attempts, however, did not seem to have any effect upon Carlson, as he made no outcry or gave any evidence that the knife was cutting him, but continued to pommel the appellant. Realizing that his situation was becoming desperate, appellant made a final lunge with his knife into the fleshy part of Carlson's left side. This wound afterwards proved fatal.

On receiving the final blow, Carlson wrenched himself free of the appellant, rose to his feet and retreated, at the same time saying, "Don't kill me," to which appellant responded, "Why, you fool, I am not trying to kill you, you are trying to kill me." Carlson then turned and proceeded to walk slowly back along the fence towards his home. Appellant followed him a short distance and then turned and walked, or ran, to his own home, from whence he drove his automobile to Raymond and there surrendered himself to a deputy sheriff. Appellant could not remember what he had done with the knife, and neither it nor the stick which Carlson is alleged to have had in his hand have ever been found. A pool of blood several inches in diam-

eter was later discovered at the point where the men fought while lying on the ground.

As already stated, the evidence thus far outlined was principally from the appellant's witnesses.

Testimony on behalf of the state with respect to Carlson after the appellant had left him, was that Carlson got as far as his own barn-yard, and there staggered and fell. His wife, hearing him call, ran to his assistance, but being unable to move him she rendered what aid she could in an attempt to alleviate his suffering and make him comfortable. At her husband's request, she returned to the house and summoned an ambulance. In a very short while, the ambulance arrived, followed immediately by the county sheriff and others. Upon being questioned regarding the affair, the deceased made statements to the sheriff and several other witnesses concerning what had happened. Carlson was then taken to a hospital in Raymond, where an operation was performed upon him and his wounds dressed. An examination disclosed that he had been stabbed seventeen times, the cause of his death being attributed to the final lunge into his side. When examined at the sheriff's office, the appellant had no wounds upon him except a cut on one finger, which he testified he had received while extracting the knife from his pocket.

Appellant assigns thirty-nine errors. These are grouped for discussion, in the briefs, under twelve heads. The first group, comprising the first four assignments, attacks the sufficiency of the information. It is contended that the charge is insufficient, for the reason that it did not allege that the deceased died in Pacific county, state of Washington.

We have had occasion to pass upon a similar contention, in the recent case of *State v. Stone, ante* p. 233, 13 P. (2d) 427. That case arose in Pacific

county, as did this case, and the language used in that information, except for one detail, was practically the same as that used in the present information. In that case, death had ensued immediately; in this case, death ensued on the following day, but within twelve hours after the occurrence. The contention made here was likewise made in the *Stone* case, and the authorities here cited were also cited there. The court, after analyzing the authorities and the reasoning of the appellant therein, held against his contention. It is therefore unnecessary to discuss this question further. Upon the authority of the *Stone* case, we hold that the information was sufficient.

Appellant's assignment of error No. 5 is to the court's denial of his motion for a new trial. This assignment is argued only generally in connection with the other assignments.

The appellant next contends, by his assignment of error No. 6, that the court erred in permitting witnesses to testify to certain statements made by the deceased shortly after the affray. While the deceased was lying in the barn-yard, and in response to questions put to him by the sheriff and others, he narrated the circumstances of the affair. The incident can best be told in the words of the sheriff, Mr. R. W. Trezise:

"Q. You may state now after the caution I gave you before using the exact words as nearly as you can? A. He said 'I am cut bad.' I said: 'Yes, you are cut bad but you will pull through.' He said 'No, I am cut bad and I will never make it, and everything I have goes to Helen.' That is his wife. I said: 'As soon as they get you to the hospital they will fix you up.' He said: 'No, I am cut too deep, I will never make it.' I said: 'What was the reason for cutting you?' He said—some time back they had trouble about the cows by getting in or out some fence and after that came the dog poisoning. . . . He said

him and his wife came out to do the chores and get the cows, and as they came out by the new chicken house he looked up on the hillside and the cows were out there, his cows. Q. This was the same day you went out there? A. Yes sir, the same day it happened. . . . He said he went out to drive the cows through this fence and he was standing there and Leo Bezemer jumped upon him behind and stabbed him time and time again with a Bowie knife.''

Mrs. Carlson testified that her husband, while they were waiting for the ambulance, told her that Leo Bezemer, the appellant, had stabbed him with a knife; that he had gone for the cows and that Bezemer had jumped him, and that he had had no chance to turn around; that he had accused Bezemer of lying in wait for him, and that Bezemer had said: ''Sure I was— Nobody can call my father a son of a bitch.'' Victor Minkler testified that deceased had said that ''Leo Bezemer was hiding in the grass by the fence and he jumped me.'' Carl Carlson, the brother of the deceased, corroborated these various statements.

The court struck the testimony with reference to the former trouble over the cows and the poisoning of the dog, but allowed the remainder to stand as a dying declaration and as a part of the *res gestae.*

The rule in this state with reference to what is admissible as a dying declaration, and what is not, is that statements of facts or circumstances immediately connected with the act of killing or of such accompanying acts, statements and conduct as shed light on it and form a part of the *res gestae,* are admissible, but that statements which relate only to previous transactions, even though they may refer to prior occurrences disclosing the motive for the killing or showing a state of hostility existing between the parties, are not admissible unless made a part of the altercation by repe-

tition or utterance. *State v. Swartz,* 108 Wash. 21, 182 Pac. 953; *State v. Long,* 163 Wash. 607, 1 P. (2d.) 844.

We think that the statements of the deceased, excepting those that were admittedly stricken by the court, clearly fall within the rule and were admissible as dying declarations; further, that the circumstances under which the statements were made come within the *res gestae* rule as expressed in *Britton v. Washington Water Power Co.,* 59 Wash. 440, 110 Pac. 20, 33 L. R. A. (N. S.) 109.

■ The appellant's next assignment of error, No. 7, is directed to the admission in evidence of testimony that the wires on the fence had been cut with an axe which was subsequently found in appellant's shed. Expert witnesses, loggers and woodsmen, testified that the particular axe had been used for that specific purpose; they gave, as their reason for so stating, the fact that the marks on the blade of the axe corresponded with certain marks on the wire and on the post. The prosecutor in his opening statement had given notice that he would adduce this testimony. When it was offered and given, no objection whatever was made thereto, and, in fact, appellant's counsel fully cross-examined thereon, and later offered testimony in rebuttal thereof.

Whatever may be our views as to the ability of even an expert to connect a particular axe, of the ordinary kind, with the wires and posts of a fence, merely by marks appearing thereon, we cannot, under the state of the record, which shows no objection thereto, review this assignment, even though the evidence might otherwise be considered irrelevant and immaterial. Whether such evidence would have been relevant and material, in the face of an objection, we need not decide.

■ Appellant's next assignment of error, No. 8,

goes to the refusal of the court to admit certain evidence. A witness, M. E. Halvorsen, had, at the instance of appellant's counsel, prepared a map of the scene of the conflict. He was asked to indicate thereon the point at which appellant's counsel had told him that the stick which deceased is alleged to have used, was afterwards found. The court sustained an objection to the request.

This evidence was clearly hearsay. There were witnesses who testified to having seen the stick on the ground and who, had they been interrogated, could have identified its location by marking the point upon the map. The evidence was properly excluded.

Appellant complains, by assignments Nos. 9 and 11, of the court's ruling on certain evidence. These assignments are not discussed. We have examined them, and find them to be without merit.

The appellant next complains, by assignments of error Nos. 12 to 16, inclusive, of the admission in evidence of the record of a former conviction. Six witnesses testified for the appellant to the effect that his reputation for being a peaceable and quiet man had been good for the period of time that he had lived in Pacific county, namely, eight years. Upon interrogation as to the reputation of the appellant in the community, these witnesses uniformly answered, "Good as far as I know," and "Never heard it questioned." Three of them, on cross-examination, stated that they had never heard the appellant or his reputation discussed at all.

Appellant took the stand as the last witness in his behalf, and on cross-examination testified that, prior to coming to Willapa, in Pacific county, he had lived in Seattle for six months, in Wyoming for several years prior thereto, and prior to that time had moved around from place to place, stopping only a short while

in each. He was then asked whether he had not lived in Mt. Vernon, Washington. He answered that he had lived there in 1908.

Being later recalled on cross-examination relative to the time that he had lived in Mt. Vernon, he admitted that in 1909 he had been convicted in the superior court for Skagit county of the crime of kidnapping. The record of his conviction was then produced by the state, offered as Exhibit "L", and admitted. It appears by that record that appellant had forceably detained one E. G. English against his will with the intent to extort money for his release. Upon conviction, that court sentenced the appellant to imprisonment in the penitentiary for a period of from three to twenty-one years, and imposed a fine of one hundred dollars.

Appellant now contends that the record of the former conviction was improperly admitted, because too remote in point of time.

Rem. Comp. Stat., § 2290, reads as follows:

"Every person convicted of a crime shall be a competent witness in any civil or criminal proceeding, but his conviction may be proved for the purpose of affecting the weight of his testimony, either by the record thereof, or a copy of such record duly authenticated by the legal custodian thereof, or by other competent evidence, or by his cross-examination, upon which he shall answer any proper question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer thereto."

It will be observed that there is no restriction in the language of the statute as to the remoteness of conviction of the crime sought to be charged. It is extensive and comprehensive in its terms.

This section of the statute is a vestigial of the early doctrine regarding infamous crimes and punishments. At the common law, infamy was held to be that state which is produced by the conviction of crime and the

loss of honor, which renders the infamous person incompetent as a witness or juror. Infamous crimes included treason, felony, any offense that tended to pervert the administration of justice, and those that fell within the term *crimen falsi* at the Roman law. 8 R. C. L., 52. Blackstone, in his Commentaries on the Law of England, Vol. 3, p. 370, says:

"Infamous persons are such as may be challenged as jurors, *propter delictum*, and thereafter never shall be admitted to give evidence to inform the jury, with whom they were too scandalous to associate."

But whatever may have been the test of the infamous character of crime, at the common law or in the earlier decisions of this country, the modern doctrine and view are that any crime punishable by imprisonment in the state penitentiary is an infamous crime. *Ex parte Wilson*, 114 U. S. 417, 5 S. Ct. 935, 29 L. Ed. 89; *United States v. Petit*, 114 U. S. 429, 5 S. Ct., 1190, 29 L. Ed. 93.

By statute generally throughout the United States, the disability imposed by the common law is now removed, so as to permit a person convicted of a crime to testify, but the record of his conviction may be shown for the purpose of affecting his credibility. Even in the absence of statute, the rule is generally followed in the various states of this country, with few exceptions. The state of Texas, however, seems to have adopted a rule peculiar to itself. In that state, an offense sought to be established by a record of conviction must involve moral turpitude, and cannot be too remote in time. The supreme court of that state has announced no definite time as being too remote, but makes the matter depend upon the existing circumstances. The cases there, however, seem to indicate that fourteen years or more are beyond the rule of admissibility. We mention the rule in Texas for

the reason that appellant has cited a number of cases from that state in support of his contention. For a comprehensive annotation of the cases under the foregoing rules, see note to 6 A. L. R., 1609 *et seq.;* 25 A. L. R., 339 *et seq.*

- We will refer to two cases from other jurisdictions indicating a contrary view. In *State v. Farmer,* 84 Me. 436, 24 Atl. 985, the defendant was charged with maintaining a liquor nuisance. The trial court admitted a record of conviction on a similar charge obtained twenty-seven years previously. On appeal the court said:

"That evidence, properly admissible for one purpose may be so perverted in its use as to effect a different and illegitimate purpose, is not altogether preventable. But such evidence cannot on that account be wholly rejected. The correction of its abuse lies in such explanation as the presiding judge may feel required to give to the jury concerning it. Then, too, when the ill-concealed purpose of its introduction becomes obvious to the jury it often reacts against the party attempting to profit by the irregularity.

"We see no cause for rejecting the record of conviction in this case in the fact that it is an ancient record. Time may soften the effect of such a record, but cannot destroy its applicability. At the common law, a person convicted of a crime unless pardoned, could never afterwards be allowed to testify as a witness. And pardon could restore only partial competency. The record was still admissible to impeach the credibility of such person. And, certainly, lapse of time would not be more efficacious for washing out the legal blot than a pardon would be. But a witness against whom a conviction of a criminal offense is produced, however ancient or modern it may be, is not without means for vindicating his character for truthfulness. He may produce general evidence to sustain his present reputation for veracity."

In *Foure v. Commonwealth,* 205 Ky. 62, 265 S. W. 443, it was held proper for the commonwealth to prove the fact that the defendant had previously been convicted of a felony committed twenty-three years before, as tending to affect his credibility as a witness.

Our own court has had frequent occasion to refer to and affirm the rule prescribed by the statute, but has never fixed a time as being too remote for the operation of the rule, nor has it ever said that any time was too remote. We have uniformly held, and categorically stated, that the record of conviction is admissible upon the question of credibility. *State v. Blaine,* 64 Wash. 122, 116 Pac. 660; *State v. Stone,* 66 Wash. 625, 120 Pac. 76; *State v. Overland,* 68 Wash. 566, 123 Pac. 1011; *State v. Turner,* 115 Wash. 170, 196 Pac. 638; *State v. Cole,* 118 Wash. 511, 203 Pac. 942; *State v. Nichols,* 121 Wash. 406, 209 Pac. 689; *State v. Mariana,* 125 Wash. 531, 217 Pac. 4; *State v. Arnold,* 130 Wash. 370, 227 Pac. 505; *State v. Serfling,* 131 Wash. 605, 230 Pac. 847; *State v. Radoff,* 140 Wash. 202, 248 Pac. 405; *State v. McCormick,* 145 Wash. 117, 259 Pac. 29; *State v. Morgan,* 146 Wash. 109, 261 Pac. 777; *State v. Brames,* 154 Wash. 304, 282 Pac. 48; *State v. Hulet,* 159 Wash. 72, 292 Pac. 107.

The record of the prior conviction was admissible, and was admitted, in this case, for one purpose only, namely, to affect the credibility of the witness. The court so instructed the jury. What weight the evidence was entitled to, was for the jury to determine. It became a subject for argument to them.

We can conceive of a situation where introduction of this character of evidence might react unfavorably upon the one who offers it; that is a risk incurred by the offer. We also recognize the damage such evidence may cause to a defendant's case. However, it remains a question to be considered by the jury in its

proper application, and is to be given such weight as they deem it entitled to under the instructions of the court and the particular circumstances of the case.

Complaint is also made, in this connection, and further by assignment No. 10, that the court erred in allowing the appellant to be recalled for further cross-examination at the time that the exhibit was offered. This was wholly within the discretion of the court, and under the circumstances disclosed by the record, that discretion was properly exercised.

The remainder of appellant's assignments of error are in regard to the instructions given by the court and to the refusal to give other instructions requested by the appellant. The court gave thirty-one instructions. The appellant requested fourteen, none of which were given in the form as requested.

Exceptions to eight of the court's instructions were taken "for the reason that it is not the law of this state and applicable to the facts of the case." The exception, we think, was insufficient under Rule of Practice VI, Rem. 1927 Sup., § 308-6. The exceptions to the court's refusal to give the requested instructions are very general, although we will not go so far as to say that they were wholly insufficient. Counsel have had no difficulty in pointing out specifically wherein they deem the instructions as given defective and why their requested instructions were peculiarly applicable. Twenty-two pages of their brief are devoted to a discussion of alleged inaccuracies of statement in the instructions given, and alleged elements in the instructions proposed which they say they were entitled to have expressed. If these features exist now in sufficient degree to call for a reversal, they were sufficiently important then to be called to the trial court's attention, so as to afford him an opportunity to make timely corrections. However, in view of the

seriousness of the situation and its consequences to appellant, we have considered the instructions given and those proposed as though the exceptions were in all respects sufficient.

Counsel do not discuss assignments Nos. 17, 18, 19, 21, 26, 27, 28 and 29, relative to requested instructions, nor assignments Nos. 31, 32, 34, 36 and 39, relative to instructions given by the court. We will therefore not discuss them in detail. We have examined them, and find that the instructions given were correct and proper, and that the proposed instructions that were not given were adequately covered by instructions that the court did give.

■ Appellant complains by assignments Nos. 20 and 33 of the court's refusal to give requested instruction No. 4, reading as follows:

"The court further instructs that an assault with the naked fists and hands is sufficient to justify killing in self-defense if there is at the time a reasonably apparent purpose by the assailant to inflict death or great bodily harm upon the assailed, and if the latter at the time believes and has reasonable grounds to believe that he is in imminent danger of death or great bodily harm at the hands of the assailant, supposing that the person assailed acts reasonably and as a reasonable man under the circumstances, as such circumstances at the time in good faith appear to him.

"The term apparent danger means not apparent danger in fact, but apparent danger to defendant's comprehension, as a reasonable man situate as he was situated."

In lieu of the requested instruction, the court gave its instructions Nos. 15 and 16, reading as follows:

No. 15. "The justification of self-defense is presented in this case and must be considered by you. The defendant while on his own premises was where he had a right to be. A person attacked on a place where he has a right to remain need not retreat but may re-

pel force by force in defense of his person against one, who at the time is actually or apparently intending or endeavoring unlawfully to kill him or inflict upon him great bodily harm, and in such defense the assailed may lawfully meet the attack made upon him in such a way and with such force as under all the circumstances he at the moment honestly believes and has reasonable grounds to believe are necessary to save his own life, or protect himself from great bodily harm and in such defense the assailed may lawfully kill the assailant, if at the time he is actually or apparently in imminent danger of death or great bodily harm at his assailant's hands, and if under all the circumstances he honestly believes and has reasonable grounds to believe such killing to be necessary to save his own life or protect him from great bodily harm;

"By the term 'great bodily harm' is meant an injury of a graver and more serious nature than an ordinary battery with the fists or pounding with the hands."

No. 16. "The court instructs you that to justify killing in self defense there need be no actual or real danger to the life or person of the party killing, but there must be or reasonably appear to be at or immediately before the killing some overt act of the person killed, which either by itself, or coupled with words, facts or circumstances then or theretofore occurring reasonably indicate to the party killing that the person slain is at the time endeavoring or immediately to endeavor to kill him or inflict upon him great bodily harm and he must honestly believe, upon reasonable grounds, that he is in imminent danger of death or great bodily harm.

"It is not necessary, however, to justify the use of a deadly weapon that the danger is actual. It is enough that it be an apparent danger, such an appearance as confronting a reasonable person would induce him to believe that he was in immediate danger of death or great bodily harm at his assailant's hands. Upon such appearances one may act with safety, and will not be held accountable, tho it should afterwards appear that the indications upon which he acted were fallacious

and that he was in no actual danger. But a person thus attacked has no right to use greater force than is necessary to repel the assailant, and he is guilty of murder if he uses greater force than he honestly believes, and has reasonable grounds to believe is necessary for his self defense.''

The proposed instruction may have been correct as a matter of law, a question which we do not decide. It was in effect given in *State v. Churchill,* 52 Wash. 210, 100 Pac. 309. But no question as to its correctness was raised there. However, even if it were correct in law, it was not mandatory upon the court to give that instruction in this case. Aside from the initial blow with the stick by the deceased, which of itself was of no great consequence, the deceased's alleged assault upon the appellant was entirely with the hands and fists. The court in instructions Nos. 15 and 16 advised the jury that the appellant had a right to stand his ground and to repel any attack made upon him even to the point of killing his assailant, if the appellant at the time and under the apparent conditions honestly believed that he was in danger of death or great bodily harm at the hands of his assailant.

Appellant complains of the concluding sentence of instruction No. 15 as quoted above. A similar contention was made in the case of *State v. Churchill, supra,* the case on which appellant here so strongly relies, but the contention was dismissed by the court in that case, in the following language:

''In order to sustain the assignment of error we would be required to hold that a simple assault or an ordinary battery would justify the taking of human life. We are not willing to stand sponsor for such doctrine.''

In view of the evidence and the instructions·given, the court was not in error in refusing appellant's requested instruction No. 4.

Appellant next contends, under assignment No. 22, that the court erred in not giving his requested instruction No. 6, to the effect that the appellant's right of self-defense was not forfeited by the fact that he was himself armed at the time with a knife. The requested instruction contained additional language with reference to the danger as apprehended by the appellant. What we have already said with reference to appellant's requested instruction No. 4, applies with equal force here, when considered in connection with instruction No. 16 given by the court, regarding the use of a deadly weapon.

Appellant's next assignments of error, Nos. 23 and 24, are to the court's refusal to give requested instructions numbered 7 and 8, which contain a statement that the defendant had a right to act according to the circumstances as they appeared to him. This very thought was expressed by the court in its instruction No. 15, and repeated in instruction No. 16.

Appellant next contends, under assignment No. 25, that the court erred in refusing to give his requested instruction No. 9, which stressed the relative strength of the two men and the appellant's knowledge of the deceased's character and disposition as circumstances to be considered by the jury in connection with the other facts in the case. If this could be said not to be a comment on the evidence, it was, at least, an undue emphasis placed upon one or two of the many and varied circumstances connected with the alleged assault. The court told the jury that they should take into consideration *all* of the circumstances. These two elements suggested by the appellant were circum-

stances which had been clearly brought out in the evidence, and, of course, were a part of what the court told the jury they should consider as a whole.

Appellant contends under assignment No. 35 that the court erred in giving instruction No. 17, which told the jury that the law did not permit one to go forward and by violence redress his wrongs or to commit an assault upon another because of insulting language used towards him. The instruction, however, coupled that statement of the law with a reservation to the appellant of the right of self-defense, as thereinbefore explained. It is, of course, the law that peace, good order, and the rules of society forbid that individuals should right their own wrongs, and further, that mere words, no matter how opprobrious or abusive, are no defense to the charge of homicide.

Appellant contends, by assignment No. 38, that it was error to give instruction No. 23½, which limited the purpose of the evidence of prior conviction to its effect upon the witness' credibility. Had the appellant requested such an instruction himself, he would clearly have been entitled to have it given. Under the evidence the instruction was proper and correct, and its purpose was protective of the appellant.

The appellant finally contends, under assignments Nos. 30 and 37, that the court erred in refusing to give his requested instruction No. 14, and in giving the court's instruction No. 19 in place of it. These instructions covered the subject of dying declarations. The instructions are too long to quote in full. Appellant's chief complaint in this connection is that the court in its instructions used the phrase "circumstances surrounding the declarant should be weighed the same as those surrounding other evidence." It is urged that this language violated the rule laid down in *State v. Eddon,* 8 Wash. 292, 36 Pac. 139, and *State*

*v. Long,* 163 Wash. 607, 1 P. (2d) 844. In those cases, this court condemned instructions which told the jury that dying declarations ''are to be treated as other evidence in the case,'' and that their truth or falsity were matters to be weighed under the same tests as are applied to other testimony.

We do not think that the language used by the court in the instant instruction offends the rule laid down in the cases cited. Here the court did not elevate the dying declaration to the same degree of credit as testimony given under oath, but merely stated that the *circumstances under which the declarations were made* should be weighed as other evidence. The circumstances themselves were testified to by witnesses under oath, and it was their direct evidence, not hearsay evidence, that was subjected to the test applied by the court. In other words, it was the circumstances under which the deceased made the declaration, and not the declaration itself, that the court indicated, by the particular instruction, should be weighed the same as the circumstances surrounding the other evidence in the case. We think that the instruction as given was proper and correct, and furthermore contained the substance of appellant's requested instruction.

We have read the entire record and considered each of appellant's assignments of error with care, and have come to the conclusion that no error was committed by the trial court, and that the appellant has in all respects had a fair trial.

The judgment is affirmed.

TOLMAN, C. J., PARKER, MITCHELL, and HERMAN, JJ., concur.