ROBERT JACKSON and HOBART JACKSON *v.* THE STATE.*

(*Nashville.* December Term, 1926.)

. Opinion filed May 7, 1927.

1. **CRIMINAL LAW. Homicide. Dying declaration. Charge of Court.**

   The different versions, in many instances, as to whether there was any dying declaration of deceased, and if so what it was, illustrates the necessity of cautioning the jury as to the reception of such testimony; and upon a failure to so charge by the court, a reversed must be had. (Post, p. 373.)

   Citing: Corpus Juris, vol. 30, note 39, page 280; Dickason v. State, 139 Tenn., 601.

2. **ATTORNEY AND CLIENT. Privileged communication. Evidence.**

   The object of the rule is, that professional intercourse between attorney and client should be protected by profound secrecy. The rule has no reference to where abstract legal opinions are sought and obtained or general questions of law, either civil or criminal, so that there is nothing to conceal of a confidential nature. (Post, pp. 374-5.)

   Citing: Shannon's Code, sec. 5785; McManus v. State, 39 Tenn., 216; 1 Greenleaf on Ev., secs. 240-244; 28 R. C. L., 559-560.

---

*Headnotes 1. Homicide, 30 C. J., section 521; 2. Witnesses, 40 Cyc., pp. 2361, 2362, 2366, 2367.

---

FROM MARION.

---

Appeal from the Circuit Court of Marion County.— HON. L. R. DARR, Judge.

M. N. WHITAKER, P. B. WHITAKER, JOHN T. RAULSTON, WALTER M. HAYNES, and J. W. MORRISON, for plaintiff in error.

ROY H. BEELER, Assistant Attorney-General, for defendant in error.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Conviction for murder in the first degree for killing Ed Smith.

The theory of the State was that, on account of bad feeling due to previous controversies, the plaintiffs in error conspired together to take the life of the deceased, and that on the afternoon of the homicide they stopped the deceased and engaged him in a fight in which the plaintiff in error, Hobart Jackson, stabbed him to death.

On the other hand, the insistence of the plaintiffs in error is that the deceased stopped of his own volition, and, with a drawn knife, attacked Robert Jackson when Hobart Jackson, in defense of the life of his brother, Robert, stabbed the deceased. There is no evidence that Robert Jackson cut the deceased or that he had his knife out.

There is considerable conflict in the testimony, and in this situation the dying declaration of the deceased, who lived about an hour became material.

Mrs. Ed Smith testified that she asked deceased how it happened and that he said, ''Oh, they stopped me and cut me to death.'' Mrs. R. A. Smith gave the same testimony.

Z. M. Zwald testified that when Mrs. Ed Smith asked deceased how it happened he replied, ''they cut me.''

Mrs. Will Holder's account of the dying declaration is that Mrs. Ed Smith asked the deceased, ''Did they jump on my darling boy?'' and his immediate reply was, ''Yes, and stabbed me.''

Dr. Price, the attending physician, who arrived in advance of Mrs. Smith and was present until the end, testified that he heard Mrs. Smith ask deceased how it occurred, and that he made no reply; that if he made a reply he should have heard it.

The different versions with respect to whether there was such a declaration, and, if so, what it was, illustrates the necessity of cautioning the jury as to the reception of such testimony.

The many reasons for the rule will be found in note 39, page 280, volume 30 of Corpus Juris, and in our own case of *Poteete* v. *State,* 68 Tenn., 261.

The only instructions contained in the charge, in regard to dying declarations, is in these words:

"There is in the proof an alleged dying statement or dying declaration of the deceased. The court instructs the jury that the dying declaration, as evidence, should be considered under the same rules that govern in determining the credibility of witnesses who testify from the stand and given the same weight and credit as if given from the stand on oath, and no more."

This instruction was positive error and in direct conflict with the express holding of this court in *Dickason* v. *State,* 139 Tenn., 601. In that case the charge of the court, with reference to the dying declaration, was as follows:

"Such statement or declaration stands before you just as the evidence of any witness examined before you and is to be considered by you just as you would the evidence of any witness introduced on the trial of this cause."

The court said:

"This instruction is made the basis of an assignment of error in this court, and this assignment is well taken, and for this error this case must be reversed.

"Ordinarily the trial court instructs the jury to receive a dying declaration with caution. There was no such admonition in his honor's charge in this case. While in the absence of a seasonable request the case would perhaps not be reversed for this omission, the portion of the charge quoted is positive error, and warrants a reversal of the case. The language quoted from the charge is not elsewhere qualified therein, and the statements of the declaration have little or no corroboration in the other evidence."

Since the case must be reversed and a new trial had for this error, we refrain from making any comment upon the facts.

Error is assigned upon the admission of the testimony of Alan Kelly, an attorney, which is as follows:

"Q. 6. Will you please state to the court and jury the conversation had with Robert Jackson at your office about twelve o'clock on the day of the tragedy, what he said to you and the question he asked, and then any further statement that he made without asking a question of law? A. He came to the office and discussed quite at length some trouble that had existed between Henry Smith and Hobart Jackson, and stated that he understood complaint was being forwarded by the postmaster about Hobart, and wanted to know whether it would be the postmaster's duty to forward as well any complaint he might have from anybody as to Henry Smith's or Ed Smith's conduct. And then, afterwards, said that Ed had interferred in the trouble between Henry Smith and Hobart Jackson, but that they had settled it among themselves, and he resented that very much, that he ought not to have done it, and that he was going to see that Hobart Jackson whipped Ed Smith. That was about it.

. . . . . . .

"Q. 8. Mr. Kelly, Mr. Bob Jackson saw you in the privacy of your office, and advised with you as a lawyer about the matter? A. Yes, sir."

It is insisted that this communication was privileged.

To this we cannot agree. All of the advice that Robert Jackson sought from Kelly was with respect to the duty of the postmaster in forwarding complaints filed against a mail carrier. The threat to have his brother whip Smith was in no wise connected with the subject-matter of his inquiry; was a statement of no fact, but was simply a casual remark, suggested, perhaps, by the fact that he had Smith on his mind.

Section 5785 of Shannon's Code is as follows:

"No attorney or counsel shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to him as attorney by such person, during the pendency of the suit, before or afterwards, to his injury."

In *M'Mannus* v. *The State,* 39 Tenn., 216, this court, speaking through Judge CARUTHERS, said:

"Sound public policy seems to have required the establishment of the rule that facts communicated by a client to his counsel are under the seal of confidence, and cannot be disclosed in proof. It is a rule of protection to the client, more than a privilege to the attorney. The latter is not allowed, if he would, to breach this zeal of secrecy and confidence. It is supposed to be necessary to the administration of justice, and the prosecution and defense of rights, that the communications between client and their attorneys should be free and unembarrassed by any apprehension or disclosure, or betrayal. The object of the rule is, that the professional intercourse between attorney and client should be protected by profound

secrecy. It is not necessary to the application of this rule, as was held in some of the old cases, now overruled, that a suit should be pending or anticipated (1 Green). on Ev., 240, note), nor that there should be a regular retainer or the payment of fees. 1 Greenl. on Ev., sec. 241. But he must be applied to for advice or aid in his professional character, and that in relation to some act past, or right, or interest in existence. . The rule has no reference to cases like the one before us, where abstract legal opinions are sought and obtained on general questions of law, either civil or criminal. In such cases no facts are or need be disclosed implicating the party; and so there is nothing to conceal of a confidential nature.

"If the defendants had perpetrated an act, and applied for legal counsel and advice in relation to it, secrecy would be imposed; but where no act had been done, or if done, not disclosed, and only a general opinion on a question of law was asked, there would be no professional confidence. It would be monstrous to hold, that if counsel was asked and obtained, in reference to a contemplated crime, that the lips of the attorney would be sealed, when the fact might become important to the ends of justice in the prosecution of crime. In such a case the relation cannot be taken to exist. Public policy would forbid it. We presume the rule has never been extended so far, nor will it be."

In 28 Ruling Case Law, 559-560, it is said:.

"It is sometimes said that all communications between counsel and client are privileged; but this is too general, and is inaccurate. They must relate to the business and interest of the client. The privilege extends only to communications connected with the business in which the attorney has been retained, and not to extraneous

matters. The communication must be made solely because of the relation of attorney and client, and in order to procure the professional advice or assistance of the attorney in relation to the subject-matter of the employment, or to explain something connected with it, so as to enable the attorney the better to advise the client, or to manage the litigation. That is to say, the communication must concern the matter in relation to which the attorney is consulted and must not be merely a bit of gratuitous information. For example, threats made by a client against the life of a person during a professional consultation with his attorney are not privileged."

For the reasons stated above, the case will be reversed and remanded for a new trial.