## ARMSTRONG v. UNITED STATES.

### No. 5999.

Circuit Court of Appeals, Ninth Circuit.

May 26, 1930.

**WILBUR, Circuit Judge, dissenting.**

Joseph H. Murray, of Cordova, Alaska, and Anthony J. Dimond, of Valdez, Alaska, for appellant.

Geo. J. Hatfield, U. S. Atty., of San Francisco, Cal., and W. N. Cuddy, U. S. Atty., of Valdez, Alaska, and Clyde R. Ellis, of Seward, Alaska, for the United States.

Before DIETRICH and WILBUR, Circuit Judges, and NETERER, District Judge.

DIETRICH, Circuit Judge.

On the evening of September 13, 1928, about 8 o'clock, at Kodiak, Alaska, the appellant shot and killed Eric Dahlberg as the latter was leaving the former's home. At the trial, upon an indictment charging him with murder in the first degree, he admitted the killing, but claimed that it was done in self-defense. Upon a conviction of manslaughter he was sentenced to serve a term of fifteen years in the federal penitentiary.

He assigns three errors, all based upon the failure of the court to give certain requested instructions, one on the subject of reasonable doubt, one touching evidence of his reputation for peace and quiet, and the other in respect of a dying declaration. Of the first it will suffice to say that the instructions given were substantially correct and reasonably adequate, and, of the second, that the request was like that considered and disapproved by us in Baugh v. United States (C. C. A.) 27 F.(2d) 257.

Prior to the homicide there had been trouble between defendant and his wife and she had brought a suit for divorce, which was still pending. His testimony, however, was that two or three days previously a reconciliation had been effected and she had returned to their home. During his absence decedent went to this home, where he found the children, but, as it turns out, not defendant's wife. According to the testimony of one of the children he brought a loaf of bread and stayed only a few minutes. As he was leaving, the defendant, who claims he had

been informed some time before of improper relations between his wife and decedent, approached. His testimony was to the effect that he came into the yard just as decedent came out on the porch and started down the trail toward him; that, in response to a question as to what he was doing there, decedent made an insolent and offensive reply and, putting his hand to his pocket, charged down upon him, whereupon he pulled his gun and shot him. The testimony supporting and opposing this theory of self-defense was for the jury, and a detailed recital of it would be irrelevant to the question under consideration.

A doctor, called soon after, found Dahlberg lying on the ground close to the road or trail, about 75 yards from the Armstrong house. After examining his wounds he caused him to be taken to a nearby hotel and in an ensuing conversation informed him that with or without a surgical operation there was little, if any, chance for his recovery; and in fact Dahlberg died the next day. He was conscious and apparently rational during these conversations. After so advising him that his wounds were, in all probability, fatal, the doctor went to his office to procure an opiate for the alleviation of his pain, and, upon returning a few minutes later, heard him make some statement to a bystander touching the disposition of what little property he possessed. Thereupon, and before the opiate was administered, in response to questions put by the doctor, he stated in substance that after he was shot he walked to the point where the doctor had found him; that after the first shot he fell voluntarily with the thought that he could thus avoid being shot again, but that defendant did shoot him again; and, further, that he had not contemplated getting into trouble when he went to Armstrong's house. It should be added that in fact three shots were fired. While objection was made to this testimony upon the ground that it was not sufficiently shown that Dahlberg was conscious of impending death, that point is not urged upon our consideration.

■ With other requests, defendant asked the court to charge the jury that: "Evidence has been introduced to show what are ordinarily called the dying declarations of the decedent; that is to say, statements which it is claimed the decedent made when he was in immediate danger of death and had no hope of recovery. You should take into consideration the fact that such dying declarations were not given under oath and the

defendant had no opportunity of cross-examination; and the testimony of all such declarations should be received and weighed by you with great caution."

Not only was the request declined, but the court failed to give any instruction of any kind upon the point. This, we think, was prejudicial error. The decided cases exhibit a wide diversity of view upon the general subject and it may be that the last clause of the request is technically subject to criticism, although it is not out of accord with some of the decisions and texts. See, for examples, Commonwealth v. Meleskie, 278 Pa. 383, 123 A. 310, and Wharton on Homicide (3d Ed.) p. 975. But, considering the gravity of the offense with which the defendant was charged, the request was sufficient to impose upon the court the duty of appropriately explaining to the jury the status of such evidence. Indeed, in some jurisdictions it seems to be held incumbent on the court of its own motion to give a proper instruction. See Pearson v. State, 143 Tenn. 385, 226 S. W. 538, 540, 541. Such evidence is exceptional, and the ordinary citizen, sitting as a juror, cannot be supposed to have knowledge of the reason of necessity underlying its reception, or to be quick to recognize its infirmities; and he may not fully appreciate the importance to a defendant of the usual right of cross-examination, the protection of which is denied him in such a case.

■■ We are unable to see how an instruction explanatory of this and other considerations and advising the jury of their duty to exercise care and caution in weighing such declarations would be violative of the Alaska statute providing that: "In charging the jury the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact." Comp. Laws Alaska 1913, § 1023. To advise the jury of a general rule of law under which evidence is to be weighed or the credibility of witnesses is to be considered is not to state the facts of the particular case or to instruct upon an issue of fact. A general rule pertaining to evidence is nevertheless a rule of law. It is a common practice to charge that the testimony of an accomplice should be closely scrutinized and weighed with caution. It is still more common to advise them of general considerations which they should bear in mind in weighing the testimony of

witnesses of different classes. They are informed that the testimony of one having an interest in the issue, not excluding the defendant in a criminal case, should be viewed and weighed in the light of that interest. It would hardly be urged that the statute above referred to is prohibitive of such practice. Indeed, in this particular case the court instructed the jury that they should take into account the conduct and appearance of the witness on the stand, the interest he had, if any, in the result of the trial, the motive he had in testifying, his relation to and feeling for or against any of the parties in the case; and, further, that there is a legal but rebuttable presumption that witnesses speak the truth, and, still further, that if they found that any witness had wilfully testified falsely in any particular they might distrust his testimony in other respects. It would seem to be highly inconsistent to hold that such a statute permits the court thus to advise the jurors of the considerations and rules under which they are to weigh testimony given by witnesses who are under oath and whom the defendant has the opportunity to cross-examine (all of which considerations and rules are presumably more or less familiar to a layman), and at the same time prohibits a statement of like character touching evidence not having the sanction of an oath, and emanating from a source not subject to cross-examination—a branch of evidence probably unfamiliar to most of the jurors. The instructions here touching the testimony of the living witnesses may very well have contributed to the prejudicial effect of the court's silence respecting the dying declaration. For example, the jurors were informed that they were to consider the motives of a witness in giving his testimony and his relation to and feeling for or against a party; but it was not pointed out that like considerations were to be borne in mind in weighing the dying declaration. See Pearson v. State, supra.

Without attempting an elaborate analysis or incorporating extensive excerpts, we may cite the following decisions as giving support to the general conclusion we have reached. While the precise question was not involved in People v. Lawrence, 21 Cal. 368, Mr. Justice Field there stated: "Declarations of this character are received with the greatest caution. They are admissible on the ground of necessity."

In Commonwealth v. Meleskie, 278 Pa. 383, 123 A. 310, 311, the Supreme Court of Pennsylvania approved an instruction that: "Dying declarations should be received and weighed with great caution, as they are necessarily wanting in the test of credibility of cross-examination, in that the jury are without opportunity of observing the temper and manner of the declarant."

In Pearson v. State, supra, among other things, the court said: "In the case of the weight to be given to dying declarations, it is fundamental that the jury shal lknow from the court the methods which they are entitled to use and adopt in determining what weight ought to be given to them."

In Jackson v. State, 155 Tenn. 371, 293 S. W. 539, the same court, quoting from its earlier decision in Dickason v. State, 139 Tenn. 601, 202 S. W. 922, said: "Ordinarily the trial court instructs the jury to receive a dying declaration with caution."

In the two cases, People v. Kraft, 148 N. Y. 631, 43 N. E. 80, 81, and People v. Falletto, 202 N. Y. 494, 96 N. E. 355, 357, the New York court seems unequivocally to hold that, as a matter of law, dying declarations cannot be given the same weight as testimony adduced under oath by witnesses who are subject to cross-examination; and the reasoning is persuasive. And such seems to be the doctrine of the Supreme Court of Washington. See State v. Mayo, 42 Wash. 540, 85 P. 251, 255, 7 Ann. Cas. 881; State v. Walker, 104 Wash. 472, 177 P. 315, 316. And see, also, State v. Eddon, 8 Wash. 292, 36 P. 139, 143. In Coart v. State, 156 Ga. 536, 119 S. E. 723, 730, the syllabus, which was apparently prepared by the court, strongly supports the view we have taken. In the decision itself we find this expression: "After a careful review of the evidence adduced to the court before the introduction of the written statement [dying declaration], we are satisfied that the trial judge did not err in permitting it to go to the jury for its consideration, under rules for their guidance which were fully and correctly given." See, also, Lipscomb v. State, 75 Miss. 559, 23 So. 210, 230, and State v. Doris, 51 Or. 136, 94 P. 44, 50, 16 L. R. A. (N. S.) 660.

Reversed, with instructions to grant a new trial.

WILBUR, Circuit Judge, dissenting.