176 So. 219

## COLLINS v. STATE.

### 6 Div. 120.

Court of Appeals of Alabama.

May 18, 1937.

Rehearing Denied June 8, 1937.

500

A. A. Carmichael, Atty. Gen., and John J. Haynes, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case charged the appellant with the offense of murder in the first degree, in that he unlawfully and with malice aforethought, killed Earl Collins by shooting her with a pistol. In the second count by stabbing her with a knife. The trial resulted in his conviction of murder in the second degree and the jury fixed his punishment at imprisonment in the penitentiary for twenty years.

The evidence disclosed that Earl Collins, the deceased named in the indictment, was the divorced wife of the defendant. That they had married and lived together as man and wife for about four years, and at the time of the killing, complained of, they had been divorced for one year during which time they had lived and remained separate and apart. The deceased was killed in the home of her mother, where she and defendant also lived during their married life. When the court granted the divorce above referred to, it also awarded alimony and solicitor's fee in favor of complainant (deceased).

Ross, Bumgardner, Ross & Ross, of Bessemer, for appellant.

At the time of the killing the appellant was in arrears with his payment of alimony and the court had instituted garnishment proceedings against his wages. Before they were divorced, the appellant had taken out a life insurance policy for $1,000 and had named the deceased as the beneficiary. The policy was in the possession of the deceased and the appellant had been trying to get possession for the purpose of changing the beneficiary. On Friday night before this killing occurred on Sunday, the deceased sent word to the appellant that she wanted to see him on the following Sunday between 10 and 11 a. m. This message was delivered to the appellant on Saturday before the killing. On the day before the killing, the deceased, who had after the divorce taken her maiden name "E. Johnson," mailed a post card to the appellant requesting him to call her or drop by to see her soon, stating on the card that she would like to discuss things with him. After the appellant received this message, and also the post card from the deceased, he got off from his duties on that Sunday and went to the house and home of the deceased, in answer to these two requests. When he arrived at her home, there was no one present except the deceased and Earl Richard Taylor, a fourteen-year old girl cousin of the deceased, and when the appellant went into the deceased's home this fourteen-year old cousin almost immediately left and went over to a neighbor's house. What happened immediately before and during the difficulty between the deceased and the appellant is in conflict. The evidence on behalf of the state tended to show that appellant shot the deceased several times and then cut her with a knife.

A state witness, the attending surgeon, whose qualifications as a surgical and medical expert were admitted, testified as to several bullet and knife wounds upon the person of the deceased, and that certain of these wounds caused her death. That one bullet pierced the left lung completely and traversed part of the right lung superficially near the base, and also passed through the spinal column with division of the spinal cord resulting in complete paralysis from the level of the umbilicus (navel) from there down, causing complete loss of sensory and motor function due to the division of the spinal cord.

One of the first persons who entered the house after the tragedy was state witness Appling, a city detective, who arrived at the scene a few minutes after the killing. Among other things he testified: "Myself and Mr. Leonard went in the house together. The officers were scattered around the house. Some one had told us to be careful, that there was a man in there that had done some shooting. The officers scattered out around the house. Mr. Leonard and myself went in the house, in the front. When we got in the house we saw two people lying on the floor, a man and a woman. We entered the door and the woman was lying there flat on her back. The man was lying on his right side with his left arm stretched out on his right side. There was a big knife there in four or five inches of his left hand, and a pistol. The woman was as bloody as a hog, blood all over her, her clothes and face and hands, and on her face was specks, spattered all over her face. The woman's hands were soaked in blood and clothes soaked in blood. I saw that she was in a serious condition but I did not take her clothes off to see where the wounds were. We found them there. She was lying there with her eyes set, her eyes set in her head. Those weapons I spoke of, knife and pistol, I have here in my possession. The pistol has six empty shells in it, all fired. I examined the chambers of that pistol and every one of the shells had been exploded. There are no bullets in them and no powder. You can see that every one of them has been fired. You could tell that the pistol had been recently fired, you could smell it. We found it right there. No one has claimed it. It is a Smith and Wesson special 32."

Earl Richard Taylor, witness for the state, testified, among other things, that she was fourteen years old and was at the time living in the home with deceased who was her cousin. And further, that: "On this Sunday that my cousin was shot I saw Jerry when he came to the house that morning. When Jerry came in my cousin was in the front room, the living room, sitting on the davenport. After Jerry had come in and sat down I came out and went out. I did not say anything to either of them as I came out. There was nobody in the house when I came out except Jerry Collins and my cousin, Earl. After I came outside I went next door. About that time I heard something that sounded like shooting. I heard some shooting, four or five shots. I did not go in the house right then and did not know the shooting was

in the house. When I heard the shooting I was on the lady's porch next door, and I walked down off the porch and turned around; and as I got in front of my house, just about to pass it, I heard some hollering, and that is what made me run in. It was my cousin, Earl, hollering. I heard her hollering for help. She said 'Help,' 'Help,' real fast. Then I went in the house. I saw my cousin when I got in there. She was lying on the floor. I also saw the defendant Jerry Collins, and he was close to her, standing over her, looking down. I saw a pistol and a knife in Jerry's hands. The pistol was in his right hand and the knife in his left hand. Jerry was standing up, looking down on her. His feet was right up on her, as close as he could get. My cousin was lying there on the floor and she was just as bloody as she could be. Blood was just about all over her, some here and on her sleeves, and I noticed some down here. I did not particularly notice her face. I said that Jerry was standing up over my cousin at that time. Jerry said 'Nobody better not come in here.' I did not understand what my cousin said. When Jerry said 'Nobody better not come in here' he was standing over her, and after he looked up and saw me, then he moved towards me and that is what made me run. At that time he turned his hands up like this, both hands up like he was going to shoot. At that time I did not see that he was hurt or wounded at any place."

Numerous other witnesses testified to facts directly corroborative to the foregoing testimony, and also that no one entered or left the house after defendant had entered, except the girl above mentioned.

The state also offered evidence to the effect that some time prior to the killing the defendant had threatened to kill the deceased. One witness testified: "It was during the divorce case, and Jerry came there on Sunday; and he said he and Earl had a divorce case in, and if Earl did win it he would not pay any alimony, because he would kill her before he would pay any alimony, he would kill everybody up there, the whole family, and showed me the pistol. The pistol he had was a shiny pistol like you have shown me but it looked newer than that."

The defendant testified as a witness in his own behalf and stated that when he went to the deceased's home they became involved in a quarrel and as he started to leave her house she got a pistol and shot at him and he seized her person and they scuffled over the pistol and while scuffling some man unknown to the appellant knocked the appellant in the head and rendered him unconscious, and when he came to he was in the Hillman Hospital being treated at this charitable institution. He also offered testimony of one of the officers that when the officer went to the hospital he found a bullet hole in the brim of the defendant's hat and powder burns around the hole. Dr. J. T. Workman, one of the physicians on the staff at the Hillman Hospital, who treated the appellant when he was first brought to the hospital, testified that there were several wounds on the right and left sides of the appellant's neck and that when he saw him these wounds were bleeding, and that there was a good bit of swelling, particularly on the right side of his neck and underneath his tongue, which pushed his tongue up; that there were powder burns on the right lobe of his ear and also a bruise near his right temple, and a penetrating wound of the left base of the thumb that went through and through and that this wound through the base of his thumb was caused apparently from a pistol ball.

The insistence of the state was, and is, to the effect that the killing complained of was premeditated, unlawful, and malicious. That there appears in the evidence a sinister motive for the killing; threats that he would kill deceased; and further that he did kill her in a cruel, atrocious, and unlawful manner.

Pending the trial, numerous exceptions were reserved to the rulings of the court. We have, as the law requires, carefully examined and considered every ruling of the court to which exception was reserved, but we shall refrain from dealing with and discussing specifically each of said exceptions. We note that learned counsel for appellant, in ably prepared briefs, address themselves to three propositions to reverse the judgment of conviction from which this appeal was taken. The first two propositions relate to the rulings of the court upon admitting in evidence the dying declarations of the deceased. In this connection it is strenuously insisted that no sufficient predicate had been laid to authorize testimony as to dying declarations.

On the question of the sufficiency of a predicate for admission of dying dec-

larations the appellate courts of this state have resorted to and made use of innumerable expressions on the subject, all of the same import, and there is no set rule necessary to be followed. It is well established in a trial for homicide, the dying declarations of the deceased, made under belief of impending death, are admissible in evidence to show who the guilty party is, and also to disclose the circumstances under which the crime was committed. It is not an indispensable prerequisite to the admission of such declarations that the deceased should say in so many words that she was in extremis, that death was impending, that there was no hope of life, but the judicial mind should be fairly satisfied that at the time the declarations were made such was the conviction of the deceased. Under the above rule, which, of course, is susceptible of further elaboration, we cannot sustain the insistence of appellant's counsel in the instant case on this question. From what has been said hereinabove, as to the dire condition of the wounded woman, it is clearly deducible even to the mind of the layman, that there was no possible probability she could live, and that such was her firm conviction clearly appears wherein she stated to the testifying witness, "she could not get well." Also, "Mama I am going, I can't make it this week. I am having too sick a spell." We see no necessity of a further discussion of this question, as we are of the opinion no error prevailed in admitting the dying declarations which disclosed not only the fact that this appellant under most abhorrent circumstances inflicted the number of wounds upon the person of his former wife with pistol and with knife as described, but in order to shield himself inflicted several superficial wounds upon his own person, all of which was in line of and in pursuance to his sinister motive and murderous threats as disclosed by the evidence above referred to.

The remaining question has reference to "Proposition 3" of appellant's brief, wherein it is insisted that error prevailed in the action of the court in limiting the defendant to a certain number of special written charges, and in refusing to pass upon a large number of such charges requested by defendant. In this connection the bill of exceptions in this case contains the following:

"Before the argument of counsel began in this case, the court asked Mr. Ross, the defendant's counsel, if he had any written charges for the consideration of the court. Mr. Ross answered that he had 54 charges. The court informed Mr. Ross that it was of the opinion those charges were excessive, and directed Mr. Ross to pick out 15 charges, and 4 general charges, making 19 charges in all, and that the court would consider these charges as to whether they would be given or refused. Mr. Ross declined to present the court with 19 selected charges as directed, and insisted that the entire number of 54 charges be considered, separately and severally, and the court declined to do so, and the defendant thereupon duly and legally excepted to the action of the court in declining to pass upon said charges, separately and severally as presented.

"Said charges are in words and figures as follows."

The charges in question are set out in full in the bill of exceptions and to the action of the court in declining or refusing to pass upon each and all of said charges the defendant duly reserved exceptions.

It is evident that the trial court acted under the provisions of a "rule of court" for the Tenth judicial circuit in undertaking to limit defendant to a reasonable number of special charges. This question has recently been considered and finally determined by this court and the Supreme Court in the cases of L. B. Porter v. State, ante, p. 441, 174 So. 313; Id., 234 Ala. 11, 174 So. 311; James Ed Glenn v. State, ante, p. 433, 174 So. 315; Kiker v. State, ante, p. 306, 172 So. 288.

In each of the foregoing cases a similar action of the trial court was declared to be error, but in none of said cases was the question raised or determined as to whether such declared error was without injury to defendant under rule 45 of the Supreme Court, and also under section 3258 of the Code 1923, which section provides: "But the judgment of conviction must not be reversed because of error in the record, when the court is satisfied that no injury resulted therefrom to the defendant." Rule 45, supra, reads: "Hereafter no judgment may be reversed or set aside, nor new trial granted by this court or by any other court of this state, in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or re-

jection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken, or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."

We are of the opinion, where the question, as here, is properly presented, we are under the duty to carefully examine and determine whether or not prejudicial error inured to defendant as a result of the action of the court in declining to pass upon the written charges requested by defendant, as above stated; and that we should examine each of said charges, and if any of such charges state correct propositions of law, to put the court to error, unless said correct charges were fairly and substantially covered by the oral charge of the court, or by charges "given" by the court. Certainly erroneous charges requested by defendant and not passed upon could not avail the defendant in any manner.

The refusal of a charge, though a correct statement of the law, shall not be cause for a reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's general charge or in charges given at the request of parties. Section 9509, Code 1923.

Upon a careful examination and attentive consideration of each and all of the charges requested by defendant as shown in the transcript, we find that the above announced provision of the statute applies to a major number of said charges. The remainder of said charges were either bad, abstract, involved, argumentative, or elliptical. Under these conditions, no error prejudicial to the substantial rights of the accused resulted in the action of the court in declining to consider these charges, hence under the provision of the statute, supra, and of Supreme Court rule 45, we hold no reversible error appears in any of the rulings of the court in this connection. Other rulings of the court hereinabove discussed are, as stated, without error. The record being regular also, it follows that the judgment of conviction from which this appeal was taken will stand affirmed.

Affirmed.