27 So.2d 48

## BROOKS v. STATE.

### 8 Div. 471.

Court of Appeals of Alabama.

March 19, 1946.

Rehearing Denied June 4, 1946.

Wm. N. McQueen, Atty. Gen., and Clarence M. Small, Asst. Atty. Gen., for the State.

Melvin Hutson and S. A. Lynne, both of Decatur, for appellant.

HARWOOD, Judge.

On September 4, 1944 the appellant, Mrs. Edna Brooks, shot her husband twice with a pistol. He lived for some twenty days thereafter. Appellant was indicted for murder in the first degree, found guilty of manslaughter in the first degree, and sentenced to five years' imprisonment in the penitentiary.

According to appellant's testimony her husband returned to their farm about 6:30 on the morning of the shooting, having been away throughout the night. He went to the barn and there met his son, by a former marriage, Solon Brooks. She overheard Solon Brooks make threats against her to his father. The deceased returned to the porch, or dog-run, of the house and began to berate her because she had allegedly neglected some farm chores. Words led to blows, and, quoting appellant: "Blood flew all over me. I straightened up in the chair, but I couldn't speak; I sat there I guess a second may be, and I commenced crying, told him he had hurt me, he had hurt me bad. He said, 'God damn you, I meant to kill you,' and he slapped this jaw (indicating) as hard as he could, and he stepped backwards, slinging his hand. He said, 'Hush that God damn screaming; you just want to get the neighbors.' He run his hand in his pocket and got his knife, and he said, 'I cut hell out of my other wife, I'll cut hell out of you,' and I screamed, and he dropped his knife and he stooped down and got his knife, and I grabbed the gun and shot him twice."

After the shooting appellant ran down the highway to the home of Robert Byars and was by him taken to her daughter's home.

Appellant said that during deceased's attack on her he tore her hair, beat her with his fists about her head and shoulders, and kicked her, and one bruise was black for twenty-six days.

Mr. and Mrs. Byars, to whose home appellant fled immediately after the shooting, each testified that appellant was suffering from nose bleed when she arrived at their home, and noticed no other significant physical signs of combat.

Pearl McDonald noticed bruises on appellant's leg two or three days after the shooting, and Mrs. Alice Glover, sister of appellant, testified that when she saw appellant after the shooting she was bruised about the arms and legs, her eyes were swollen, her nose was skinned, and there were knots on her head.

However, Dr. Price Irwin, a practicing physician of Moulton, examined appellant about 48 hours after the shooting and this physician found no knots on her head, or bruises anywhere other than a bruise on one knee "as you would expect from a fall."

Showings were permitted as to two of appellant's absent witnesses. The material portion of these showings was that these two witnesses, who lived in the neighborhood of the Brooks home, heard two shots fired immediately together and after the lapse of a short space of time heard a third shot. One of the above showings also was to the effect that prior to the shooting there had been loud talk and cursing at the Brooks about a calf being out, the voices being recognized as those of deceased and his son Solon Brooks. The State however presented some three neighbors as witnesses who testified that they heard only two gun reports.

The State's case was dependent on the admission as dying declarations of certain statements made by deceased to Solon Brooks, his son, and Mrs. Ruby Hill, his daughter, to whose home he was brought after his stay in the hospital.

The deceased was carried to a hospital by his son Solon Brooks shortly after he was shot on September 4. He was suffering from two bullet wounds which penetrated the left shoulder and ranged downward, penetrating the chest cavity and lung. In the opinion of his physician he improved at the hospital, and left the hospital some sixteen days after his admission, and was taken to the home of his daughter Mrs. Ruby Hill. On the twentieth day after he was shot his physician was called

to Mrs. Hill's home and deceased died of a hemorrhage about thirty minutes to an hour after the physician's visit.

Solon Brooks testified that immediately on reaching the hospital deceased told him that "he wouldn't get well," and made numerous statements to him to this same effect, such as he "wasn't aiming to get well," "she had got him," all during his stay at the hospital, and on the day he died told him again that he would not get well.

Mrs. Hill testified that deceased told her at the hospital "Ruby I'm going to die," and on the day he did die he made similar statements to her, the last one being made shortly before the visit of the physician, and about three or three and a half hours before he did die.

Dying declarations of course constitute one of the numerous exceptions to the hearsay rule. Lack of oath, and opportunity to cross-examine are the usual reasons assigned for excluding hearsay testimony. Today the lack of opportunity to cross-examine is the reason emphasized, said by some to result from the decreasing regard for the sanctity of oaths. In the case of dying declarations these two objections resulting from their hearsay character are thought to be counterbalanced by the pure and reverent mood that should pervade a human being harboring a consciousness he is about to enter the abyss of death. That such theories for the admission of this type of testimony are sometimes fallacious has been recognized. In People v. Falletto, 202 N.Y. 494, 96 N.E. 355, 357, the New York Court of Appeals said "Experience shows that dying persons have made self-serving declarations, such as false accusations, in order to destroy their enemies, and false excuses * * * to save their friends." Illustrative of the soundness of the above statement, completely conflicting dying declarations are present in the early Alabama case of Moore v. State, 12 Ala. 764, 46 Am.Dec. 276. The functional necessity of dying declarations has been candidly recognized, demanded by the interests of society in the suppression of human killings. As stated by Edmund Morgan in his foreword to the Model Code of Evidence of the American Law Institute: "Some judges have frank-

ly said that the policy of facilitating the criminal prosecution of manslayers induces the courts to accept this evidence despite its frailties; hearsay is better than nothing, and it is needed because the chief witness in this class of case has always been put out of the way."

Regardless of the assigned reason for the admission of dying declarations, that they are competent evidence is now completely established.

A comprehensive summary of the principles evolved by the Alabama decisions in connection with the admission of dying declarations is set forth in Shikles v. State, 31 Ala.App. 423, 18 So.2d 412, 414, certiorari denied 245 Ala. 641, 18 So. 2d 417, wherein Justice Simpson, then a member of this court, wrote:

"No hard and fast general rule can be laid down to control the admissibility of dying declarations. The circumstances of each case must be considered—the condition of the person, as well as what he says in regard to approaching dissolution. Lewis v. State, 231 Ala. 211, 164 So. 92; Parker v. State, 165 Ala. 1, 8, 51 So. 260, 262. The Parker case approvingly quotes Professor Wigmore on the subject: 'No rule can be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is a poor policy to disturb the rulings of the trial judge upon the meaning of these circumstances.' 2 Wigmore on Evidence, p. 1809, § 1442.

"Nor is it an indispensable prerequisite to admissibility that declarant should state in haec verba that he is in extremis, that there is no hope of life, and that death is imminent, just so the judicial mind is fairly convinced by legally sufficient evidence after a careful consideration of all the circumstances that at the time such declarations were made such was the conviction of deceased. Lewis v. State, supra; Collins v. State, 27 Ala.App. 499, 176 So. 219.

"All the attendant circumstances tending to show the declarant's state of mind, as his statements, nature of the wounds, his weakness, etc., may be looked to by the trial court in considering the predicate for admissibility. Ragland v. State, 238 Ala. 587, 192 So. 498. And that declarant was

under a sense of impending dissolution may be inferred from his apparent condition, such as the nature of his injuries and evident danger. Wilson v. State, 28 Ala.App. 496, 188 So. 274.

"Nor is admissibility controlled by the length of the interval between the declarations and death, but by the declarant's state of mind and his conviction that death is imminent. Titus v. State, 117 Ala. 16, 23 So. 77; Sowell v. State, 30 Ala.App. 18, 199 So. 900.

"These principles are well known but are restated in deference to the urgent insistence of counsel that no proper predicate was laid for admitting the dying statements of deceased, and as sustaining authority for our contrary conclusion. Under our decisions, as well as on the general principles laid down, we think the trial court should be affirmed in admitting the statements. See also Ross v. State, 233 Ala. 201, 171 So. 246, where our Supreme Court ruled such evidence admissible upon the predicational statement of deceased that 'I am just about gone' or 'I am half dead'; and Pattillo v. State, 245 Ala. 192, 16 So.2d 303, where deceased stated, 'Doctor, he has got me, hasn't he?'"

We do not feel that it is within our province to say that the trial court was in error in admitting the alleged declarations of deceased through the agency of the witnesses Brooks and Mrs. Hill.

The deceased's version of this difficulty, thus vicariously presented to the jury through statements made by him to Solon Brooks and Mrs. Hill, and in our opinion properly admitted in evidence as dying declarations, was that he was sitting on the porch of the house with appellant and when he turned his head was shot twice by appellant. While Mrs. Hill's account gives no background Solon Brooks stated his father said that he had asked appellant if she "was aiming to cook him any breakfast, and she said she didn't think she would, and he said he was going to Solon's to get a cup of coffee, and she said she didn't think he would, and about that time he turned his head to the right, toward the back door and she shot him twice in the left shoulder.".

Able counsel for appellant strenuously argues that the trial court erred in refusing to give written charges 1, 4, and 5. The New York cases of People v. Falletto, 202 N.Y. 494, 96 N.E. 355 and People v. Bartelini, 285 N.Y. 433, 35 N.E.2d 29, the Washington case of State v. Eddon, 8 Wash. 292, 36 P. 139, and the Mississippi case of Muse v. State, 158 Miss. 449, 130 So. 693, and the Federal case of Armstrong v. United States, 9 Cir., 41 F.2d 162, cited by counsel sustain his point. However after careful examination of Alabama decision it is our opinion that these charges were properly refused as being argumentative, invasive of the province of the jury, going to the weight and sufficiency of the evidence, and unduly emphasizing a particular phase of the evidence. See Sims v. State, 139 Ala. 74, 36 So. 138, 101 Am.St. Rep. 17; Boswell et al. v. Thompson, 160 Ala. 306, 49 So. 73; Birmingham Railway, Light & Power Co. v. Seaborn, 168 Ala. 658, 53 So. 241; McLaughlin v. Beyer, 181 Ala. 427, 61 So. 62; Tingle v. Worthington, 215 Ala. 126, 110 So. 143; Raney v. Raney, 216 Ala. 30, 112 So. 313.

We are also of the opinion that these same objections are applicable to appellant's requested written charge No. 16.

In her account of the difficulty appellant stated that deceased said to her "I cut hell out of my other wife." Such evidence falls far short of the required method of establishing deceased's reputation for peace and quietude, which was not shown otherwise. For this reason requested charge 6 was properly refused as being abstract under the developed competent evidence of this case.

Refused charges 12, 14, and 22 are completely covered by the oral charge of the court, or other requested written charges which were given at the request of the appellant.

In our opinion this case should be affirmed, and it is so ordered.

Affirmed.

## On Rehearing.

HARWOOD, Judge.

In their brief in support of their application for rehearing the able and conscien-

tious counsel for appellant argue that we erred in stating in our opinion that Solon Brooks testified that his father had told him at the hospital that "he would not get well" and other statements to that effect, and that we were also in error in stating that Mrs. Ruby Hill had testified that her father had told her at the hospital that he was going to die.

Pertaining to the testimony of Solon Brooks concerning the statements made by his father the record is as follows:

"Q. Down here at the hospital, after you brought him to town, did you have a conversation with him about his condition, about whether he would live or die? A. He said he wouldn't get well.

"Q. I say, did you have a conversation with him? A. Yes, sir.

"Q. When was that—more than one time? A. Half a dozen times, I guess.

"Q. Do you recall when the first time was? A. He told me Monday after I brought him to town, after I got him to the hospital.

"Q. I'll ask you in that conversation, if your father told you he couldn't get well, he was going to die? A. What was the question?

"Q. Did your father tell you anything about whether he would get well?

"Mr. Hutson: We object to him leading the witness.

"The Court: Sustain the objection.

"Q. I'll ask you, Mr. Brooks, did you have a conversation with your father over at the hospital after he was shot? A. Yes, sir.

"Q. In which he discussed with you the question of whether or not he would live or not? A. Yes, sir.

"Q. What did he say with reference to that. A. He just said she had got him.

"Q. What did he say with reference to whether or not he was going to die or get well?

"Mr. Hutson: We object to him leading the witness.

"Q. Tell what he said then? A. He said he wouldn't get well.

"Q. What else did he tell you about how he got hurt?

"Mr. Lynne: We object, because no sufficient predicate has been laid, and because the preliminary proof is too slight and indefinite to authorize an admission of a declaration of this type; it does not show it was made under the sense of impending death; does not show he had no hope of recovery; does not show it was made in the shadow of impending death; does not show a settled, hopeless expectation that his death was near at hand; does not show that he was then conscious of a swift and certain doom; does not show he was then under the impression of almost immediate dissolution.

"The Court: When was it he made that statement, Mr. Brooks? A. After he got to the hospital the first time; that was Monday about nine or ten o'clock, after I got him up there.

"The Court: Was that the 4th of September? A. Yes, sir.

"The Court: Then did he make that statement any other time while there? A. Yes, sir.

"The Court: When was the other time or times? A. He told me three or four times that week; then he told me Sunday before he died Sunday night.

"The Court: On the day you got him to the hospital, or the day that he got to the hospital, what did you say he said with reference to his recovery or not? A. He said he wouldn't get well.

"The Court: Are those the words he used? State what words he said. A. He asked the doctor, and the doctor said, 'Oh, Maybe you'll make it,' and he says, 'I don't think I will, do you, Solon?' He says, 'I don't think I'll ever get well.' That was just not long after I got him there, he was talking.

"The Court: He said, 'I don't think I'll ever get well?' A. Yes, sir, 'Don't believe I'll get well.'

"The Court: That's all he said then? A. Yes, sir.

"The Court: Gentlemen, I think there is a difference between ' * * * don't think he is going to get well,' and 'Think he is going to die.' I sustain the objection for the present.

396

"Q. (Mr. Almon) Mr. Brooks, did you tell the Court just now when he asked you something, that your father said, 'I don't believe I'll get well?' A. That he wasn't aiming to get well.

"Q. Wasn't aiming to get well? A. Yes, sir.

"Q. Mr. Brooks, did you have any conversation with your father—that was the first conversation you had with him over at the hospital—is that right? A. Yes, sir.

"Q. Did you ever have any conversation with your father after that about his condition, whether or not he would live or whether he would die, his opinion about it? A. Yes, sir.

"Q. I believe you said you talked with him about his condition just an hour or two before he died? A. Yes, sir.

"Q. What did he say to you in that conversation about whether he was going to live or die? A. He said he was aiming to die.

"Q. You mean by that your father told you he was going to die? A. Yes, sir, said he wasn't aiming to get well.

"Q. Wasn't aiming to get well? A. Yes, sir.

"Q. What did your father tell you in that conversation an hour or two before he died about the defendant over here, and about the wounds in his shoulder?

"Mr. Lynne: We object, on the same grounds set out while ago.

"The Court: At the time he talked to you that time was Dr. Irwin there, or had he been there that night? A. That was just before the doctor came down.

"The Court: That was before he came? A. Yes, sir.

"The Court: Overrule the objection.

"Mr. Lynne: We except."

From reading the above portion of the record it is clear to each member of the court that the objection sustained by the court was to the question: "What else did he tell you about how he got hurt?" This question clearly pertained to the dying declaration itself, and not to the questions establishing the predicate for the admission of such declaration. It is clear to us that statement in the opinion about which counsel complains as to Solon Brooks' testimony is a fair and accurate reflection of the record. It is noted there were no objections even interposed to such statements of Solon Brooks which we quoted, nor was any motion made to exclude these statements.

Likewise the objection sustained by the court to the question propounded by the State to Ruby Hill was to the question: "What did he tell you after he told you that, about how he got wounded?"

This question was propounded *after* the witness had testified without objection that over at the hospital her father had told her he was going to die, and without any motion having been made to exclude such testimony.

Appellant argues that the court erred in sustaining the State's objection to the question: "Then you raised up about it and told your father what you were going to do to her, didn't you?" The record shows that the witness answered "No, Sir" to this question, and that thereafter objection was interposed and sustained. However no motion to exclude the answer was made. The objection coming too late, and no motion to exclude the answer having been made, there is nothing to review.

In our opinion the trial court did not err in sustaining the State's objection to the following question: "And prior to this difficulty you shot at her and your father both, didn't you?" which was asked after the witness Solon Brooks had testified that he did not "feel so good (towards appellant) right now, but I never had a cross word with her." There had been no testimony concerning witness' feelings towards his father, and the question involved specific acts to show bias of this witness toward both appellant and his father. The court could not be said to have erred in sustaining the objection had the question concerned the father only. An answer to the question as propounded would have necessarily included acts showing bias against the father as well as appellant. When both competent and incompetent testimony is called for by a single question, a court is not bound to separate the admissible from the inadmissible, and

will not be put in error for sustaining an objection to a question containing such dual characteristics. Consford v. State, 15 Ala.App. 627, 74 So. 740, certiorari denied 200 Ala. 23, 75 So. 335; Harris v. State, 17 Ala.App. 13, 81 So. 349.

 Likewise it is our opinion that the court below correctly sustained the objection interposed by the State to the following question propounded to the witness Solon Brooks: "And isn't it your purpose to get rid of her" (appellant) "so that you will get that place—isn't that your purpose in this case?" The question assumes, in complete absence of any evidence to that effect, that Solon Brooks would get his father's place if appellant were got rid of. Questions assuming the truth of facts unproved by evidence are properly excluded. Butler v. State, 16 Ala.App. 234, 77 So. 72; Edmonds v. State, 16 Ala.App. 157, 75 So. 873; Haithcock v. State, 23 Ala.App. 460, 126 So. 890; Cox v. State, 25 Ala.App. 38, 140 So. 617.

Application for rehearing overruled.

Lewey Robinson, of Birmingham, for appellant.

Wm. N. McQueen, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.