326 So.2d 303

**Robert WILLIAMSON**

**v.**

**STATE.**

**7 Div. 364.**

Court of Criminal Appeals of Alabama.

Jan. 20, 1976.

Robert L. Rumsey, III, Sylacauga, for appellant.

William J. Baxley, Atty. Gen.., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was put to trial upon an indictment charging murder in the second degree. He was represented at arraignment and trial by Court-appointed counsel. He pleaded not guilty. The jury returned a verdict finding appellant guilty of manslaughter in the first degree and fixed his punishment at ten years' imprisonment in the penitentiary. He gave notice of appeal. New and employed counsel represents him on this appeal.

The testimony was in sharp conflict. The testimony for the state tended to show that appellant cut or stabbed the deceased, without any provocation, outside a Negro cafe near Lineville, Clay County, Alabama, on the night of August 3, 1974, and that he

died later that night as the direct and approximate consequence of the knife wounds. The testimony on behalf of appellant was that he was attacked by the deceased and that he cut the deceased in self-defense.

The sufficiency of the evidence is not presented to this Court for review as there was no motion to exclude the state's evidence for failure to make out a prima facie case; there was no motion for a new trial; there was no request for the affirmative charge, and no exceptions were reserved to the Court's oral charge to the jury. *Eady v. State,* 48 Ala.App. 726, 267 So.2d 516; *Tally v. State,* 54 Ala.App. 34, 304 So.2d 275; *Mosley v. State,* 54 Ala. App. 59, 304 So.2d 613; *Jackson v. State,* 52 Ala.App. 667, 296 So.2d 753; *Frazier v. State,* 53 Ala.App. 492, 301 So.2d 256.

However, in deference to matters raised in appellant's brief, we will deal with the pertinent facts in this case.

Willie Clifford Brown testified that he was a double first cousin to appellant and that on the night of August 3, 1974, he went with the deceased, Benny James Turman, to Amos Turman's Cafe arriving there around 9:00 p. m. They had been in the cafe five or ten minutes when appellant came in with his wife and one Bernice Underwood. He further stated that when appellant came in, neither he nor the deceased spoke to him and that he and the deceased walked out of the cafe and went to his car to leave. That when they were standing by his car, appellant came out of the cafe and said, "Wait a minute, Benny, I want to talk to you a minute." That the deceased turned around to see what he wanted and Brown saw appellant reach toward his back pocket. The deceased had not said anything to appellant and he did not see a weapon of any kind in the possession of Benny, and he made no move in the direction of appellant and did not grab him. When appellant reached for his back pocket, Brown hollered to Benny to watch

him, saying, "I knew he had something, but I did not know what he had." Brown further stated he did not see appellant cut Benny, but the next thing he saw was Benny turned and started running and appellant ran after him. At this time appellant's wife called him and he stopped. Brown went behind the cafe and into the woods trying to find Benny but he did not locate him. That the next time he saw Benny was at a local hospital.

James A. Wood testified that he was related to Benny Turman by marriage. On the night of August 3, 1974, he was driving his car to the cafe. In the car with him were his brother-in-law and sister-in-law. He first saw the deceased standing against a railing of a bridge on Highway 49 in Lineville with his shirt off; he was holding the shirt over his wound and the shirt was bloody. He stopped his car and told Benny to get in the car and he would take him to a doctor. Benny was too weak to get in the car without help. They finally got him in the car and carried him to the Clay County Hospital in Ashland. Benny was bleeding badly and there was blood in his car. This witness testified that he knew appellant and his nickname was "Goose."

Mary Wood, the wife of James Wood, testified that they picked up Benny on the overhead bridge on Highway 49 and carried him to the hospital and that she stayed with him at the hospital until he was carried to Birmingham that night. That he was carried to the operating room where the doctors and nurses treated him and then he was brought back into the hallway where she was and also his father had arrived.

From the record:

"The Court: If anything, what did he say, if anything, about dying, at that time and place?

"A. I am going to say the exact words he said, he said, 'Daddy, help me,' he

said 'Help me, Daddy, I'm dying,' and his eyes went up and back and he just went to sleep."

After Benny told his Daddy he was dying, a nurse asked him who stabbed him and he said, "Robert Williamson."

After Benny told his Daddy to "help me, I'm dying," his Daddy turned and walked out and Mary Wood walked up to the bed and called him and he looked up at her and said, "Goose stab me," and he never said another word.

Mr. James M. Buttram testified that he was employed by the State Department of Toxicology and Criminal Investigation and that his primary duties are related to investigation of death. After stating his education, experience and qualifications, he was asked how many autopsies he had conducted and he replied, "In excess of two hundred and fifty."

He further testified that he performed an autopsy on the body of Benny Turman who was identified to him by the Coroner. He stated that there were two stab wounds and that in his opinion death was due to hemorrhage and shock associated with the stab wound which severed major blood vessels within the liver. Mr. Buttram took two photographs of the deceased and they were admitted in evidence without objections. He went into great detail in describing the two stab wounds on the body of the deceased which we do not deem necessary to set forth.

Mr. Michael Harris, a Patrolman for the City of Talladega, and former Police Chief for the town of Lineville, investigated the death of Benny Turman. In the course of the investigation he went to appellant's home along with Sheriff John Green of Clay County. Appellant was given the *Miranda* rights and warnings and he signed a waiver of rights form and signed a statement which was witnessed by Harris and Sheriff Green. The *pre-Miranda* predicate was laid and appellant's statement was introduced in evidence as State's Exhibit No. 4 and is as follows:

*"STATE'S EXHIBIT NO. 4*

August 4, 1974

STATEMENT OF ROBERT WILLIAMSON:

"I left my home around 10:00 p. m. and went over to Amos Turman's Cafe to shoot pool. When I walked into Amos', Benny Turman was inside at the counter. I stood just inside the door and Benny Turman motioned for me to go outside; he said he was going to get me. He (Benny Turman) went outside and I came out. Benny Turman and I have had trouble in the past. While outside he reached for me and I backed off and got my knife out of my pocket, because he already had his hand in his pocket and I didn't know if he had a gun or a knife. I hit him with my knife somewhere around his stomach then turned and ran a few feet then got in my car and left with my wife and we went home and went to bed.

"I was awaken at my home around 5:45 a. m. by Sheriff John A. Green and Michael L. Harris, Chief of Lineville Police. Sheriff Green advised me I was under arrest for the killing of Benny Turman. I was advised of my rights and taken to Clay Co. Sheriff's Office for questioning by Sheriff Green & Chief Harris.

"I voluntarily signed a waiver and gave my statement to them.

/s/ ROBERT WILLIAMSON

/s/ Michael L. Harris

/s/ John A. Green"

While at appellant's home the knife used to cut the deceased was recovered and was introduced in evidence by stipulation.

Dr. C. P. Horn testified that he practiced medicine in Ashland, Clay County, Alabama, and was called to the hospital to see Benny Turman and found him in a critical condition with blood pressure forty over thirty which is severe shock. It was determined that the patient was in such condition that it was necessary to transfer him to the University Hospital in Birmingham. He was dead on arrival at the University Hospital. The doctor identified State's Exhibit No. 2 as being Benny Turman.

The evidence adduced on behalf of the accused showed that there were bad feelings between appellant and the deceased. That the deceased had threatened appellant on several occasions over a period of many months. The deceased had shot into appellant's car and home on two or more occasions. Their feelings toward each other were such that both were put under peace bonds.

Appellant's wife corroborated his testimony as to previous trouble and also as to what occurred on the night of August 3, 1974, outside the cafe where the fight took place.

On cross-examination she admitted that she had gone with the deceased.

Appellant was asked if he knew his wife and the deceased had gone together and he said that he knew it and thought that everyone else knew it also.

Appellant claims there was a fatal gap in linking the evidence to show the cause of death. He states there was no evidence of any nature of what transpired at the University. The record does not support this contention. Mr. Aubrey Camp of the Clay County Rescue Squad who drove the ambulance carrying Benny Turman to the University Hospital testified, without objection, that he was announced dead on arrival.

■ Appellant contends that the trial court erred in admitting the dying declara-

tion made by the deceased to his father while he was still in the hospital before he was put in the ambulance to be transported to Birmingham. We disagree with this contention. The rule is best stated in *Shikles v. State,* 31 Ala.App. 423, 18 So.2d 412, wherein the Court held:

"No hard and fast general rule can be laid down to control the admissibility of dying declarations. The circumstances of each case must be considered—the condition of the person, as well as what he says in regard to approaching dissolution. *Lewis v. State,* 231 Ala. 211, 164 So. 92; *Parker v. State,* 165 Ala. 1, 8, 51 So. 260, 262. The *Parker* case approvingly quotes Professor Wigmore on the subject: 'No rule can be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is a poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances.' 2 Wigmore on Evidence, p. 1809, § 1442.

Nor is it an indispensable prerequisite to admissibility that declarant should state in haec verba that he is in extremis, that there is no hope of life, and that death is imminent, just so the judicial mind is fairly convinced by legally sufficient evidence after a careful consideration of all the circumstances that at the time such declarations were made such was the conviction of deceased. *Lewis v. State,* supra; *Collins v. State,* 27 Ala.App. 499, 176 So. 219.

All the attendant circumstances tending to show the declarant's state of mind, as his statements, nature of the wounds, his weakness, etc., may be looked to by the trial court in considering the predicate for admissibility. `Ragland v. State,* 238 Ala. 587, 192 So. 498. And that declarant was under a sense of impending dissolution may be inferred from his apparent condition, such as the nature of his injuries and evident danger. *Wilson v. State,* 28 Ala.App. 496, 188 So. 274.

Nor is admissibility controlled by the length of the interval between the declarations and death, but by the declarant's state of mind and his conviction that death is imminent. *Titus v. State,* 117 Ala. 16, 23 So. 77; *Sowell v. State,* 30 Ala.App. 18, 199 So. 900."

The trial court is vested with discretion in the conduct of a trial and appellate courts will not interfere therewith unless it clearly appears that there has been an abuse of discretion. *Townsell v. State,* 255 Ala. 495, 52 So.2d 186; *Dolvin v. State,* 51 Ala.App. 540, 287 So.2d 250; *Carson v. State,* 49 Ala.App. 413, 272 So.2d 619.

There is nothing in the record before us even tending to show that the trial court transcended his authority or abused his discretion in propounding questions to the various witnesses to elicit relevant and material evidence. *Brandes v. State,* 17 Ala. App. 390, 85 So. 824.

Conflicting testimony is for the jury, and a verdict rendered thereon will not be disturbed on appeal. *Eady v. State,* 48 Ala.App. 726, 267 So.2d 516; *Pugh v. State,* 51 Ala.App. 164, 283 So.2d 616.

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.